761 So.2d 1074 (2000)
Joaquin J. MARTINEZ, Appellant,
v.
STATE of Florida, Appellee.
No. SC90952.
Supreme Court of Florida.
June 15, 2000.
*1076 Peter Raben of the Law Offices of Peter Raben, P.A., Miami, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Candace M. Sabella, Assistant Attorney General, Tampa, Florida, for Appellee.
Sharon L. Kegerreis and Mayda Prego of Hughes Hubbard & Reed, LLP, Miami, Florida, for Ilustre Colegio De Abogados De Madrid ("Madrid Bar Association"), Amicus Curiae.
PER CURIAM.
Joaquin J. Martinez appeals his convictions of armed burglary, two counts of first-degree murder, and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

FACTS
Martinez was charged with armed burglary and two counts of premeditated murder for the killing of Douglas Lawson and Lawson's girlfriend Sherrie McCoy-Ward. The jury convicted Martinez of both murders and the trial court imposed a sentence of death for the murder of McCoy-Ward and a sentence of life imprisonment without the possibility of parole for the murder of Lawson.
*1077 The bodies of the victims were found in their home on October 31, 1995, by McCoy-Ward's sister, Tina Jones. Witness testimony at trial placed the murders as having occurred between the afternoon of October 27, 1995, and midnight on October 30, 1995.
Lawson died from gun-shot wounds and McCoy-Ward died from multiple stab wounds. Although the victims had been shot and stabbed, the police did not find any murder weapons at the scene. Forensic experts combed the residence, lifting latent fingerprints and collecting pieces of hair, clothing, fingernails, fiber samples and blood for examination. However, despite the collection of more than one hundred samples of blood, hair, fingernails, cigarette butts and similar physical evidence, no evidence linked Martinez to the murders.
The initial investigation revealed no signs of forced entry and no personal items appeared to be missing from the victims' residence. However, investigators found two Rottweiler dogs locked away in an upstairs bedroom, expensive music equipment and a substantial amount of hidden money in the house. At the conclusion of the crime scene investigation, police had no leads. Nonetheless, the police did find a list of names and telephone numbers on a piece of paper discovered in the kitchen. The police began telephoning the numbers listed, including a pager number listed by the name "Joe."
After leaving several messages on "Joe's" pager number, the police eventually received a call on January 27, 1996, from Sloane Martinez, the defendant's ex-wife. Sloane Martinez informed the police that she had kept Martinez's pager after their divorce. Detective Michael Conigliaro, the lead investigator on the case, then went to Sloane's home where she informed him of her growing suspicions of Martinez's involvement in the homicides. While the detective was at her home, Sloane received a phone call from Martinez and she invited the detective to listen in on their conversation. Detective Conigliaro testified that he heard Sloane telling Martinez that a homicide detective had been paging her. During that phone conversation, Detective Conigliaro also heard Martinez tell Sloane that "this is something that I explained to you before, and that I am going to get the death penalty for what I did." Sloane asked Martinez if the incident involved the Lawson case, and Martinez responded, "No, I can't talk to you about it on the phone right now."
After this conversation, Sloane agreed to allow authorities to wire her house for audio and video recording and to attempt to engage Martinez in conversation regarding the double homicides. The following day, January 28, 1996, Martinez arrived at Sloane's house. Detective Conigliaro testified that he, Corporal Baker, and Assistant State Attorney Karen Cox[1] watched and listened to the conversation from a remote location as it was being recorded by both audio and videotape. Although Martinez did not confess during the conversation with Sloane, he did make several remarks that could be interpreted as incriminating. After leaving Sloane's home, Martinez was immediately arrested by police.
The State's case at trial focused on the testimony of Sloane Martinez and the audio-video tape. Sloane testified concerning the above-described conversations as well as her observations of Martinez's behavior from October 27, 1995, until the time of his arrest. She also testified about other statements that Martinez made to her that heightened her suspicions regarding his involvement with the murders.
The State introduced other circumstantial evidence. For example, Laura Babcock, *1078 the defendant's ex-fiancee, testified. On Friday morning, October 27, 1995, Martinez left her apartment and told her that he was going to see his brother Ronnie, and that he planned to get in touch with a friend, "Michael," who owed him money. She also testified that when the defendant returned to her apartment between 11 p.m. and midnight, he was wearing clothing that did not fit him properly and he had a swollen lip and scraped knuckles.
In addition to this testimony, Eden Dominick, a friend of Babcock and Martinez, testified that Martinez arrived at her apartment around 8 p.m. on Friday, October 27. According to Dominick, Martinez appeared as if he had been in a fight. Before leaving, Martinez asked to leave a briefcase at Dominick's residence, but she refused his request.
Several jail inmates also testified against Martinez. One jail inmate, Neil Ebling, testified that Martinez admitted to committing the murders. Two other inmates, Larry Merritt and Gerrard Jones, testified about a scheme that Martinez designed in jail to implicate another individual for the crimes. Jones claimed that Martinez agreed to pay Jones $400 for assisting him with his case.
The defense called several witnesses to establish an alibi and to contradict the testimony of the jail inmates. However, defense counsel never filed a notice of an alibi defense or requested a jury instruction on an alibi defense.[2]
Martinez raises ten issues on appeal.[3] Because we find that error occurred when the prosecutor elicited testimony from Detective Conigliaro as to his opinion of Martinez's guilt, we discuss this point first.

OPINION OF GUILT TESTIMONY
The State called the lead investigator, Detective Conigliaro, to testify as to his investigation of the homicides. During the investigation, Detective Conigliaro, with Sloane Martinez's permission, listened to Sloane's telephone conversation with Martinez on January 27. The following day, *1079 he also monitored the audio-visual surveillance of the subsequent conversation between Sloane and Martinez that ultimately led to his arrest. During the State's redirect examination of Detective Conigliaro, the prosecutor asked the following:
Q. Corporal, when you were listening to that tape live, when you were listening to what was going on live on January 28th, right after that you said that you were authorized to arrest?
A. Absolutely.
Q. Was there any question, not based on your memory, not based on the transcript, was there any question in your mind that at that time that the Defendant had murdered Douglas Lawson?
The trial court overruled defense counsel's objection and the prosecutor continued to inquire about Detective Conigliaro's opinion of the defendant's guilt:
Q. Was there any doubt in your mind based on what he said then that he was responsible for the murder of Douglas Lawson?
A. There was no doubt that he did it.
The prosecutor highlighted this opinion testimony during closing argument: "You see, after the video tape was done, as Corporal Conigliaro told you, and as he told you, Baker and another Assistant State Attorney, Ms. Cox, no one had a doubt. He was arrested because nobody had a doubt that he was guilty." (Emphasis supplied.)
We begin our analysis with the basic proposition that a witness's opinion as to the guilt or innocence of the accused is not admissible. See Glendening v. State, 536 So.2d 212, 221 (Fla.1988) (citing Lambrix v. State, 494 So.2d 1143, 1148 (Fla. 1986)); Henry v. State, 700 So.2d 797, 798 (Fla. 4th DCA 1997); Zecchino v. State, 691 So.2d 1197, 1198 (Fla. 4th DCA 1997); Spradley v. State, 442 So.2d 1039, 1043 (Fla. 2d DCA 1983); Gibbs v. State, 193 So.2d 460, 463 (Fla. 2d DCA 1967). Section 90.703, Florida Statutes (1997), which provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it includes an ultimate issue to be decided by the trier of fact," would appear to allow opinion testimony of the defendant's guilt. However, such testimony is precluded on the authority of section 90.403, Florida Statutes (1997), which excludes relevant evidence on the grounds that its probative value is substantially outweighed by unfair prejudice to the defendant. See Glendening, 536 So.2d at 221. "Any probative value such an opinion may possess is clearly outweighed by the danger of unfair prejudice." Id. We find "[i]t is clear that error is occasioned where a witness, including a lay witness, is permitted to offer her opinion about the guilt of the defendant." Zecchino, 691 So.2d at 1198.
In Henry, the Fourth District addressed the effect of improper testimony giving an opinion of guilt. 700 So.2d at 798. The defendant in Henry was charged and convicted of robbery after being identified by a high school student who claimed that the defendant had stolen a gold chain from the student at school. Following the incident, the student victim ran to his mother's vehicle in the school parking lot and informed her of the theft. After describing the perpetrator to his mother, the mother recalled seeing a person who matched the perpetrator's description near her vehicle just moments before the theft. See id. At trial, the prosecutor asked the mother, "Do you have any doubt that this [defendant] is the person who robbed your son?" and the witness answered, "No." Id. Defense counsel objected to the question as calling for a legal conclusion concerning the guilt of the accused and the prosecutor subsequently apologized. See id. However, on redirect examination of the mother, the prosecutor again asked, over the defense's objection, whether the witness had "any doubts that we are here charging the wrong person." Id. The witness responded that she had no doubt at all. See Henry, 700 So.2d at 798.
The Fourth District concluded that the mother's improper opinion testimony could *1080 not have been harmless because it may have impermissibly bolstered the other evidence of identification. See id.; see also Zecchino, 691 So.2d at 1198 (reasoning that improper opinion testimony of the defendant's guilt was not harmless in a circumstantial evidence case where identity was at issue). Reversing the defendant's conviction, the Fourth District in Henry held that the mother's opinion of guilt testimony was improper because it invaded the province of the jury. See Henry, 700 So.2d at 798.
Further, there is an increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant's guilt. In this situation, an opinion about the ultimate issue of guilt could convey the impression that evidence not presented to the jury, but known to the investigating officer, supports the charges against the defendant. See United States v. Young, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). In the context of an improper prosecutorial argument to the jury, the United States Supreme Court in Young explained why it is improper for a representative of the government to express his or her personal opinion concerning the guilt of the accused:
[S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.
Id. (emphasis supplied); see also Berger v. United States, 295 U.S. 78, 88-89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (finding prosecutorial argument to be improper because it suggested to the jury that the prosecution had personal knowledge of the defendant's guilt).
Although in a different context, this Court has expressed its concern that error in admitting improper testimony may be exacerbated where the testimony comes from a police officer. See Rodriguez v. State, 609 So.2d 493, 500 (Fla.1992). In Rodriguez, a police officer corroborated a story told by a testifying witness by discussing the witness's prior consistent statements, which were not properly admissible. See id. We cautioned that "[w]hen a police officer, who is generally regarded by the jury as disinterested and objective and therefore highly credible, is the corroborating witness, the danger of improperly influencing the jury becomes particularly grave." Id. (quoting Carroll v. State, 497 So.2d 253, 257 (Fla. 3d DCA 1985)).
In this case, it was ultimately for the jury to decide whether the statements made by Martinez to Sloane established his guilt. The jury heard the audio-video taped conversation and, as the trier of fact, was charged with the responsibility of determining the weight to be given to that evidence. It was an impermissible invasion of the province of the jury for Detective Conigliaro, the lead investigating officer in this case, to express his opinion that after he listened to the conversation as it was occurring he had "no doubt" that Martinez committed the murders. Further, the clear and equally impermissible implication in this case was that Detective Conigliaro obtained some additional knowledge from monitoring the surveillance live that was unavailable to the jury. However, there was no evidence presented to the jury that Detective Conigliaro had heard some other statement by Martinez, not recorded on the video tape, that would lead him to have "no doubt" of Martinez's guilt. Thus, the admission of this opinion of guilt testimony was error.
Having found preserved error in the admission of Detective Conigliaro's opinion of Martinez's guilt, we must assess whether the error is harmless. See State *1081 v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986). Although in some cases opinion of guilt testimony may be harmless, see Zecchino, 691 So.2d at 1197-98, this is not such a case. A "harmless error analysis requires an examination of the entire record." DiGuilio, 491 So.2d at 1135. In this case, no physical evidence linked Martinez to the crime. By far, the most potentially damaging piece of evidence was the surveillance audio-videotape that was monitored by Detective Conigliaro and other State agents. In light of the lack of physical evidence in this case, the audio-videotape was a critical piece of evidence. The prosecution, in seeking a conviction and death sentence, relied heavily upon the interpretation to be drawn from a series of potentially incriminating remarks made during this conversation.
We find that the prejudice flowing from the erroneous admission of this testimony was compounded by the State's closing argument. The assistant state attorney told the jury: "You see, after the video tape was done, as Corporal Conigliaro told you, and as he told you, Baker and another Assistant State Attorney, Ms. Cox, no one had a doubt. He was arrested because nobody had a doubt that he was guilty." (Emphasis supplied.) Because no one other than Detective Congliaro had testified to his or her opinion of guilt, this argument was not even based on evidence in the record. Further, this argument was improper because prosecutors may not directly or indirectly express their opinions as to the credibility of witnesses or the guilt of the defendant. See Young, 470 U.S. at 18-19, 105 S.Ct. 1038; D'Ambrosio v. State, 736 So.2d 44, 45-49 (Fla. 5th DCA 1999). Moreover, as we recently expressed:
It is particularly improper, even pernicious, for the prosecutor to seek to invoke his personal status as the government's attorney or the sanction of the government itself as a basis for conviction of a criminal defendant.
The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says. That same power and force allow him ... to impress on the jury that the government's vast investigatory network, apart from the orderly machinery of the trial, knows that the accused is guilty or has non-judicially reached conclusions on relevant facts which tend to show he is guilty.
Ruiz v. State, 743 So.2d 1, 4 (Fla.1999) (quoting United States v. Garza, 608 F.2d 659, 662 (5th Cir.1979)). By arguing that Martinez was arrested because the State's agents who listened to the videotape had no doubt of his guilt, the prosecutor engaged in impermissible bolstering of the State's case by asserting the superior knowledge and certainty of the government's agents.
Therefore, based on an examination of the record as a whole, we cannot find the improper opinion of guilt testimony to be harmless beyond reasonable doubt, especially when it was again highlighted in closing argument. See DiGuilio, 491 So.2d at 1138-39. In making this determination, we further examine the other errors claimed in closing argument because "the harmless error test requires an examination of the entire record. The reviewing court must examine both the permissible evidence on which the jury could have legitimately relied and the impermissible evidence which might have influenced the jury's verdict." Whitton v. State, 649 So.2d 861, 865 (Fla.1994).

OTHER CLOSING ARGUMENT ERRORS
In addition to raising the prosecutor's improper use of opinion testimony during closing argument, Martinez also claims on appeal that the prosecution made numerous other improper remarks in closing argument. In particular, Martinez takes issue with an impermissible reference to the term "injunction" and an attack on the *1082 defendant's character during closing argument.
As to the prosecutor's use of the term "injunction" in closing argument, the trial court had ruled prior to trial pursuant to a motion in limine that the prosecutor was prohibited from using that term.[4] Despite the fact that the court specifically instructed the prosecution to inform the State's witnesses not to mention the word "injunction" during their testimony, Sloane Martinez used the term during her direct examination. The trial court sustained a timely objection by the defense but denied a subsequent motion for mistrial. Later, the prosecutor himself violated the motion in limine when he twice referred to the "injunction" during closing argument. Although this reference was not contemporaneously objected to, the defense subsequently made a motion for a mistrial, arguing that it created a false impression of spousal abuse.
"[P]rosecutorial improprieties must be viewed in the context of the record as a whole to determine if a new trial is warranted." Sireci v. State, 587 So.2d 450, 452 (Fla.1991). We do not find that the court abused its discretion when it refused to grant a mistrial solely on the basis of the use of the term "injunction" by the witness and prosecution. See Cole v. State, 701 So.2d 845, 853 (Fla.1997), cert. denied, 523 U.S. 1051, 118 S.Ct. 1370, 140 L.Ed.2d 519 (1998); Sireci, 587 So.2d at 452. However, it is of concern to this Court that the prosecution violated the trial court's ruling. We find it difficult to understand how the interests of justice are furthered when a prosecutor runs the risk of reversal by twice violating a specific pretrial ruling.
Further, during closing argument, the prosecutor also commented on Martinez's character by stating:
You see, when you think about the defendant, you've got to realize who you're dealing with here. You think a man who thinks about being, number one, a man who doesn't tell the truth. He doesn't tell the truth to the women he's involved with; he cheats on them; he runs around on them, not just once, not just twice. That's who we're dealing with here. That's who he's looking out for.
However, the well-established rule in Florida relating to character evidence is:
The character of a person accused of crime is not a fact in issue, and the state cannot, for the purpose of inducing belief in his guilt, introduce evidence tending to show his bad character or reputation, unless the accused, conceiving that his case will be strengthened by proof of good character, opens the door to proof by the prosecution that his character in fact is bad. This salutary rule is not permitted to be violated by the state, even when the defendant offers himself as a witness.
Jordan v. State, 107 Fla. 333, 334, 144 So. 669, 669 (1932). Because Martinez did not testify or present witnesses who testified about his good character, the defense did not open the door to enable the prosecution to present evidence of bad character. See id. The type of character attack utilized by the prosecutor has no place in closing argument.
Standing alone, these comments would not constitute fundamental error, see Kilgore v. State, 688 So.2d 895, 898 (Fla.1996), nor would they have warranted a mistrial. See Cole, 701 So.2d at 853. Thus, neither the improper references to the "injunction" nor the attack on Martinez's character in closing argument would alone require reversal. However, it is appropriate to consider both the preserved and unpreserved errors in determining *1083 whether the preserved error was harmless beyond a reasonable doubt. See Gore v. State, 719 So.2d 1197, 1202 (Fla. 1998); Whitton, 649 So.2d at 865; Jackson v. State, 575 So.2d 181, 189 (Fla.1991). Thus, these additional closing argument errors further support our determination that the error in admitting the properly preserved opinion of guilt testimony was not harmless beyond a reasonable doubt.

STATE'S USE OF TRANSCRIPT
Although our reversal renders it unnecessary to address the remaining points, in order to assist the trial court on remand, we deem it appropriate to address Martinez's claims regarding the State's use of the audio-video tape of the conversation and the use of a transcript of that conversation by the jury as an aid while the audio-video tape was being played.
Before trial, the defense unsuccessfully moved to exclude the police recording alleging that it was "to a large extent unintelligible and therefore incomplete." The defense also objected to a transcript of the recording prepared to assist jurors in their review and understanding of the audio-video tape. At the pretrial hearing, Sloane Martinez and Detective Conigliaro testified as to how they prepared the transcript. Over a three-day period, both Sloane Martinez and Detective Conigliaro sat in a room where they replayed the tape making notations as to what they heard on the recording. Sloane Martinez testified that, based on her memory of events and having listened to the tape, the transcript was an accurate transcription of the intercepted conversation between herself and her ex-husband.
As the conversation occurred, Detective Conigliaro, Corporal Baker, and Assistant State Attorney Karen Cox listened to the police surveillance from a remote location through a listening device. Detective Conigliaro also verified the accuracy of the transcript, relying on having listened to the conversation as it was taking place as well as listening to the videotape. Detective Conigliaro also testified that the quality of what he heard as the conversation was taking place was better than the recorded version. Moreover, he testified that he and Sloane Martinez were extremely conservative in preparing the transcript and they did not include items that they did not hear.
The trial court ruled that the audio-video tape could be played for the jury and that the State could provide jurors with the copies of the written transcript. The jurors were allowed to read the thirty-three-page transcript as an unadmitted court exhibit while prosecutors played the surveillance tape to the jurors. However, the trial court ruled that jurors could not take copies of the transcript back to the jury room during deliberations.
We begin first with the law concerning the use of the audio-video tape. The general rule in Florida regarding admissibility of partially inaudible tape recordings is that "[p]artial inaudibility or unintelligibility is not a ground for excluding a recording if the audible parts are relevant, authenticated, and otherwise properly admissible." Odom v. State, 403 So.2d 936, 940 (Fla.1981). Such recordings are admissible unless the inaudible and intelligible portions are so substantial as to deprive the audible portions of relevance. See id.; Henry v. State, 629 So.2d 1058, 1059 (Fla. 5th DCA 1993); Harris v. State, 619 So.2d 340, 342 (Fla. 1st DCA 1993).
On appeal, Martinez does not assert that the trial court improperly admitted the audio-video tape but asserts error with regard to the jurors' use of the transcript. Martinez argues that the transcript should not have been used at trial because: (1) it was not properly authenticated; (2) it included portions that were inaudible on the tape; and (3) the trial court did not give a jury instruction limiting the jury's consideration of the transcript.
The Fourth District has explained the general law in Florida that the jury may "view an accurate transcript of an admitted *1084 tape recording as an aid in understanding the tape so long as the unadmitted transcript does not go back to the jury room or become a focal point of the trial." Macht v. State, 642 So.2d 1137, 1138 (Fla. 4th DCA 1994). In Hill v. State, 549 So.2d 179, 182 (Fla.1989), we found no error where the jury utilized a transcript. In Hill, the defendant did not claim that the transcript was inaccurate, the jury did not carry the transcript into the jury room, and the transcript did not become a focal point of the proceeding. Therefore, the transcript did not displace the actual tape as the evidence upon which the jury relied.
Similarly, in Grimes v. State, 244 So.2d 130, 135 (Fla.1971), the accuracy of the transcript was not an issue. In Grimes, the transcript of the defendant's tape-recorded statement had been properly authenticated by the officer who recorded it. We thus explained that "the transcription was properly authenticated by the person who took the statement and who verified that the transcript was the same evidence as the recording." 244 So.2d at 135. Therefore, this Court found no error where the transcript was published to the jury, but not admitted into evidence or used by the jurors during deliberations. See id.; see also Hill, 549 So.2d at 182.
In this case, Martinez claims that it was improper to allow jurors to use the transcript because it contained many statements that could not actually be heard on the tape. In explaining the potential dangers from a transcript, the United States Court of Appeals for the District of Columbia observed:
A transcript repeating in written form a conversation recorded on tape may help a juror listening to the tape follow the conversation when the tape is of questionable clarity, or contains the voices of multiple speakers who talk over each other or speak in quick succession. Ironically, the same circumstances that make a transcript helpful to a juror may prejudice the defendant if it is presented without proper safeguards, for the only transcripts worth fighting about are those on which important words may be susceptible to different interpretations. After all, the jurors are likely to notice a clear discrepancy between a tape and a transcript.

United States v. Holton, 116 F.3d 1536, 1540 (D.C.Cir.1997) (emphasis supplied) (citations omitted), cert denied, 522 U.S. 1067, 118 S.Ct. 736, 139 L.Ed.2d 673 (1998).
One of the primary dangers of allowing the jury to use an unadmitted transcript is that it may become the evidence that the jury relies upon rather than the tape itself:
The principal risk of indiscriminately permitting the use of transcripts by jurors is that in the case of a poor quality or unintelligible recording, the jurors may substitute the contents of the more accessible, printed dialogue for the sounds they cannot readily hear or distinguish on the tape and, in so doing, transform the transcript into independent evidence of the recorded statements. A related risk arises when a transcript attributes incriminating statements to a defendant that the defendant does not admit making. Placing a transcript in the jury room during deliberations after the completion of the supervised, adversarial portion of the trial opens up the possibility that jurors will see the transcript as a neutral exhibit placed before them by the court and increases the chance that the document will be read without the tape recording playing alongside for the purpose of comparison.
Id. at 1540-41 (citations omitted).
In fact, precautionary procedures have been developed by the federal courts to decrease the risk that jurors will rely more heavily on the unadmitted transcript than admitted taped recordings. See, e.g., United States v. Robinson, 707 F.2d 872, 876 (6th Cir.1983); United States v. Slade, 627 F.2d 293, 302 (D.C.Cir.1980). Because *1085 of the danger that the jury might rely on an unadmitted transcript that contains statements attributed to the defendant that cannot be heard on the tape, we deem it appropriate to discuss procedures for trial courts to follow when faced with this circumstance in the future.
For example, as set forth in Slade, the "ideal procedure for testing accuracy is to have the prosecution and defense attorneys stipulate to a transcript." 627 F.2d at 302. If they cannot agree, "the second best alternative is for the trial court to make a pretrial determination of accuracy by reading the transcript against the tapes" to ascertain whether the transcript is accurate. Id.
A third alternative is to present the jury with two transcripts, containing both sides' versions, and let the jury determine which is more accurate. In this situation, because no one transcript is presented as "correct," the judge "need not necessarily listen to the tapes or pass on the accuracy of any transcript."
Id. (quoting United States v. Onori, 535 F.2d 938, 948 (5th Cir.1976)); see also Robinson, 707 F.2d at 876 (noting that the third method is the "least preferred method" to use during trial).
While the Eighth Circuit's procedures for use of transcripts are slightly different, its goal is consistent with the other circuits, which is to set forth procedures to ensure the accuracy and fairness of the transcripts. See United States v. McMillan, 508 F.2d 101, 105 (8th Cir.1974). First, the "transcript should normally be used only after the defendant has had an opportunity to verify its accuracy and then only to assist the jury as it listens to the tape." Id. In cases where a defendant disputes the accuracy of the transcript, "a foundation may first be laid by having the person who prepared the transcripts testify that he has listened to the recordings and accurately transcribed their contents." Id.
Reviewing the available procedures for allowing juries to use transcripts, the Sixth Circuit in Robinson ultimately concluded:
We therefore reiterate our preference for using a transcript when the parties stipulate to its accuracy. But in the absence of a stipulation, we hold that the transcriber should verify that he or she has listened to the tape and accurately transcribed its content. The court should also make an independent determination of accuracy by reading the transcript against the tape. Where, as here, there are inaudible portions of the tape, the court should direct the deletion of the unreliable portion of the transcript. This, however, assumes that the court has predetermined that unintelligible portions of the tape do not render the whole recording untrustworthy. Finally, we find submission of two versions of the transcript prejudicial when the tape is significantly inaudible. Such a practice would undoubtedly inspire wholesale speculation by the parties and engender jury confusion. It would be entirely too difficult for the jury to read two separate transcripts while listening to the tape recording. Furthermore, this method is impractical in cases such as this where the defendant has asserted his fifth amendment right to remain silent.
Robinson, 707 F.2d at 878-79 (emphasis supplied).
In recognition of the case law in this State that has allowed the use of transcripts under certain circumstances, we set forth guidance for trial courts facing this situation in the future. The goal is for the trial court to balance the benefit of giving the jury an aid to understanding the tape against the danger of allowing an unadmitted transcript to become the evidence upon which the jury relies where neither the judge nor jury would be able to verify the accuracy of what is contained on the transcript.
Preliminarily, the trial court must determine that the unintelligible portions *1086 of the tape do not render the whole recording untrustworthy. See Odom, 403 So.2d at 940; Henry, 629 So.2d at 1059; Harris, 619 So.2d at 342. As for the transcript, trial courts should exercise extreme caution before allowing transcripts of recordings to be viewed by the jury. See Robinson, 707 F.2d at 876; Slade, 627 F.2d at 302. The preferred approach is for the parties to stipulate to the accuracy of the transcript. See Slade, 627 F.2d at 302. If there is a dispute as to the accuracy, the trial court should make an independent pretrial determination of the accuracy of the transcript after hearing from persons who can properly testify as to its accuracy. See Robinson, 707 F.2d at 876; Slade, 627 F.2d at 302. Those who may be able to verify the accuracy of the transcript are: (1) the actual participants to the conversation; or (2) those who listened to or overheard the conversation as it was being recorded, so long as such persons can establish that the quality of the conversation that they overheard or listened to was better at the time they overheard it than the quality of the tape recording.[5]
We emphasize that there may be a difference between tape recordings that are difficult to hear and of poor quality and those that contain inaudible portions. Where the tapes are partially inaudible, jurors will be unable to make an intelligent comparison between the recording and the transcript. Under such circumstances, "[t]he practical effect of using an aid to comprehend unintelligible matter is that the aid becomes the evidence." Robinson, 707 F.2d at 878. Accordingly, if the trial court determines that there are inaudible portions of the tape, the trial court should delete the inaudible portions from the transcript before submitting the transcript to the jury. See id.
In addition, as in this case, where a transcribed version of an audio-video tape is used as an aid to the jury and there is no stipulation as to its accuracy, trial courts should give a cautionary instruction to the jury regarding the limited use to be made of the transcript.[6]See Slade, 627 F.2d at 303. For example, the following instruction, quoted with approval by the Fourth District, was given by the trial court in Macht:
This transcript is not admitted and won't be admitted into evidence. The evidence is what's on the tape recording. If there's a conflict between what the transcript says and what you hear the tape says[,] the evidence is the tape, not the transcript and if you'reif you hear a conflict[,] what's on the tape is what the evidence is.
642 So.2d at 1138 (alteration in original).[7] The federal circuits that have considered *1087 this issue agree that whenever a transcript is allowed by the trial court, it is "important that the judge instruct the jurors that their personal understanding of the tape supersedes the text in a transcript." Slade, 627 F.2d at 302; see Holton, 116 F.3d at 1541; Onori, 535 F.2d at 949; McMillan, 508 F.2d at 106. In this regard, although the trial court should provide jurors with cautionary instructions, we also note that such instructions are "only viable when the tape is clear enough for a juror to detect that the tape is at variance with the transcript." Robinson, 707 F.2d at 878.
Having reviewed the proper procedures to be employed prospectively for using transcripts at trial, we now turn to the transcript in this case. Martinez admits that Sloane Martinez could authenticate the transcript because she participated in the recorded conversation. See Grimes, 244 So.2d at 135; Macht, 642 So.2d at 1138. However, Martinez claims that the transcript could not be used at trial because Sloane Martinez admitted that she alone did not prepare the transcript. Although Sloane was not solely responsible for the preparation of the transcript, she was able to verify its accuracy. Specifically, she testified that she recalled the original conversation while making the transcript. In addition, she stated that the transcript only included words that she could actually make out from the tape.
Furthermore, we find no error in also allowing Detective Conigliaro to authenticate the transcript. Detective Conigliaro testified at trial that the conversation between Sloane and Martinez "sounded so much clearer" from the surveillance van than it did on the audio-video taped recording. Nevertheless, we caution that the trial court should not allow the validity of the transcript to be bolstered by testimony from those who simply listened to the tape after it was made. As discussed by First District in Harris, if the authenticating witness neither participated in nor overheard the recorded conversation as it was taking place, the authenticating witness would be "in no better position than the jury to determine the contents of the tape recording." Harris, 619 So.2d at 343; see Henry, 629 So.2d at 1059 ("[I]t was error for the trial court to allow the transcript to be used by the jury" where the transcript was prepared by a person who did not witness the events recited in transcript.).
We next turn to Martinez's claims that the transcript includes many inaudible portions. In support of this, he points to comments made by the trial court and the prosecutor as well as portions of the tape the court reporter shows as "inaudible" that appear on the transcript. However, the fact that the court reporter did not transcribe all of the portions that appeared on the transcript does not establish that those portions transcribed are in fact inaudible. Rather, it may simply show that from the court reporter's vantage point, portions of the recording were too difficult to hear to be able to simultaneously record them. While the court reporter is required to transcribe the contents of the tapes as they are played at trial, the court reporter's transcript of the tape does not establish the inaccuracy of the transcript or the tape's audibility. See Lawrence v. State, 632 So.2d 1099, 1100 (Fla. 1st DCA 1994).
The videotape is part of the record on appeal on this case. We agree that the videotape is of poor quality and portions of the conversation are difficult to hear for a variety of reasons, including young children crying, occasional passing trains, and background interference on the tape. Thus, if upon remand Martinez is able to *1088 establish that there is an inaccuracy in the transcript or that a portion of the tape is inaudible (as opposed to difficult to hear), the court should exercise its discretion in deleting those portions of the transcript. However, because Sloane Martinez participated in the actual conversation, she would be able to testify to what Martinez actually said. See § 90.803(18)(a), Fla. Stat. (1995). As for the use of the transcript by the jury, the transcript was not admitted into evidence and jurors were not allowed to use the transcript during their deliberations. Nevertheless, the transcript was available to the jury during the playing of the video taped conversation. It appears that the transcript was also available during Sloane Martinez's direct examination, including when she testified as to her personal knowledge of what was on the inaudible portions of the recorded conversation after prosecutors played the tape to the jury. Allowing jurors to review the transcript during both the playing of the audio-video tape and during Sloane Martinez's testimony could have placed undue emphasis on the transcript and we caution the trial court to ensure that the transcript's use is limited.
Although the trial court did not give a cautionary instruction, we also note that none was requested and the failure to give such an instruction would not rise to the level of fundamental error. See Archer v. State, 673 So.2d 17, 20-21 (Fla.1996). However, because we are reversing for other reasons, we direct that if, upon remand, the trial court again decides it permissible to allow the jury to use a transcript of the conversation as an aid to understanding, a cautionary instruction should be given.
Accordingly, for the reasons stated in this opinion, we reverse Martinez's convictions, vacate his sentences, and remand for a new trial.
It is so ordered.
HARDING, C.J., and SHAW, PARIENTE, LEWIS and QUINCE, JJ., concur.
ANSTEAD, J., specially concurs with an opinion.
WELLS, J., concurs in result only with an opinion.
ANSTEAD, J., specially concurring.
I concur in the majority opinion and write separately only to note my view that while it is clear that the tape recording was sufficiently audible to be admitted, a transcript of the tape recording made in this case should not be used for any purpose upon retrial. It is for the jury to determine what is contained in the tape recording. Of course, those that listened to the conversation being recorded can testify to what they heard. But permitting that testimony is far different than presenting the jury with a tangible transcript that contains statements that the jurors themselves cannot hear when listening to the recording. The recording "speaks for itself," and is the best evidence of what it says.
WELLS, J., concurring in result only.
I concur only in the result in this case. I conclude that the opinion of the police officer does create the same serious adverse effect which concerned the United States Supreme Court in United States v. Young, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). At trial, the force of the police officer's opinion of guilt is prejudicially irrelevant in favor of the unique responsibility of the jury to make that decision.
I do not join in the argument portion of the opinion. I do not join in what I am concerned is an expansion of the doctrine of fundamental error as it relates to closing argument.
I do not join in that portion of the opinion with respect to the use of a transcript that sets out a procedure for the future use of such transcripts. While I do *1089 not take particular issue with any part of the procedure, I believe the establishment of such procedures should be done by rule and not by opinion. By proposing a rule, the pros and cons of various parts of a procedure are able to be thought through so that potential problems with the procedure will be better understood. That does not happen when we do this in an opinion. I am wary of unintended consequences. Therefore, I cannot join.
NOTES
[1] Although Assistant State Attorney Karen Cox, the wife of lead prosecutor Nicholas Cox, was apparently involved in the investigation of the murders, she did not participate in the prosecution of Martinez during the trial. In addition, neither Assistant State Attorney Karen Cox nor Corporal Baker testified as witnesses at trial.
[2] Martinez raises his trial attorney's failure to request an instruction as a claim of ineffective assistance of counsel as part of his first point on appeal. With rare exception, ineffective assistance of counsel claims are not cognizable on direct appeal. See Kelley v. State, 486 So.2d 578, 585 (Fla.1986); State v. Barber, 301 So.2d 7, 9 (Fla.1974); see also Blanco v. Wainwright, 507 So.2d 1377, 1384 (Fla.1987) ("There are rare exceptions where appellate counsel may successfully raise the issue on direct appeal because the ineffectiveness is apparent on the face of the record and it would be a waste of judicial resources to require the trial court to address the issue.") Because we are not presented with a case where ineffective assistance of counsel is apparent on the face of the record and are reversing for a new trial on the basis of other errors, we do not need to address this point.
[3] The claims are: (1) the cumulative nature of trial court errors, discovery violations, prosecutorial misconduct, and ineffective assistance of counsel resulted in a fundamentally flawed trial and denied the defendant his constitutional right to a fair proceeding; (2) the prosecutor violated the discovery rules, specifically Florida Rule of Criminal Procedure 3.220(j), by failing to advise the defense of changes in witnesses' testimony; (3) the trial court erred in failing to instruct the jury regarding the defendant's alibi defense; (4) Martinez was deprived of effective assistance of trial counsel in violation of his constitutional rights; (5) the trial court erred in permitting jurors to view a state-prepared transcript of an audio-video tape that contained the defendant's incriminating remarks; (6) the prosecutor committed misconduct violating Martinez's right to a fair trial by (a) eliciting Detective Conigliaro's opinion as to the defendant's guilt; (b) referring to Detective Conigliaro's opinion of defendant's guilt during closing argument; (c) making false representations during closing argument regarding the motive for the crimes; (d) improperly attacking Martinez's character during summation; and (e) admitting prejudicial autopsy photographs of the victims; (7) the trial court erred in finding Martinez guilty of burglary and in finding the burglary to be an applicable aggravating circumstance; (8) Florida's capital sentencing statute is unconstitutional; (9) the trial court erred in finding the heinous, atrocious, or cruel aggravating circumstance to be applicable; and (10) the imposition of the death penalty is disproportionate in this case.
[4] Martinez filed a motion in limine before trial to prevent the State from referring to the word "injunction" out of fear that it would prejudice him because the jury would infer that the injunction referred to spousal abuse or stalking. The Court granted Martinez's motion.
[5] We do not address the situation where an expert witness professionally skilled in understanding inaudible and indistinguishable tape recordings testifies that the transcript is an accurate rendition of the tape recording. See Henry v. State, 629 So.2d 1058, 1059 (Fla. 5th DCA 1993); Harris v. State, 619 So.2d 340, 343 (Fla. 1st DCA 1993). The considerations and procedures used in such cases to determine if a transcript is admissible are beyond the scope of this opinion.
[6] Because there is no standard cautionary jury instruction on the use of transcripts, we request that the Committee on Standard Jury Instructions in Criminal Cases study this issue and recommend a proposed instruction.
[7] A similar admonition is found in the Eleventh Circuit Court of Appeal Standard Instruction:

Members of the Jury:
As you have heard, Exhibit has been identified as a typewritten transcript [and partial translation from Spanish into English] of the oral conversation which can be heard on the tape recording received in evidence as Exhibit . [The transcript also purports to identify the speakers engaged in such conversation.]
I have admitted the transcript for the limited and secondary purpose of aiding you in following the content of the conversation as you listen to the tape recording, [particularly those portions spoken in Spanish,] [and also to aid you in identifying the speakers.]
However, you are specifically instructed that whether the transcript correctly or incorrectly reflects the content of the conversation [or the identity of the speakers] is entirely for you to determine based upon your own examination of the transcript in relation to your hearing of the tape recording itself as the primary evidence of its own contents; and, if you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.
Eleventh Circuit Standard Trial Instruction 5 at 512-13.