RAMIREZ, J.
Jesus Gutierrez was convicted of three counts of lewd and lascivious battery on a child less than sixteen years of age. He was sentenced to two consecutive ten-year terms in jail on two counts and fifteen years probation on one count, to run consecutively to the two ten-year terms. For the reasons that follow, we affirm his convictions and sentences.
In October 2002, when S.J., the victim, met Gutierrez, a City of Miami police officer, she was fourteen years of age, and the officer was approximately thirty-three years old. Jackie Lazo, S.J.’s friend, told Gutierrez that S.J. liked him. S.J. and Lazo then met Gutierrez. S.J. and Gutierrez kissed, and Gutierrez touched S.J.’s breast and vagina. Gutierrez penetrated her vagina with his finger. Another police officer, Anthony Perez, saw Gutierrez and S.J. together at this time. Lazo saw the two kiss, but did not see any other sexual contact. Officer Perez did not see Gutierrez and S.J. kiss.
Gutierrez and S.J. met for the second time a few days later. At a motel, Gutierrez and S.J. began kissing. She disrobed, and he performed oral sex on her. They engaged in vaginal sex. S.J. then performed oral sex on Gutierrez. They had sexual intercourse, then left the motel.
In January 2003, S.J. and Gutierrez met again outside the home of S.J.’s friend. He kissed S.J. and digitally penetrated her vagina. Sometime after that, the two had oral and vaginal sex at another motel. In May, Gutierrez and S.J.' met again and had oral and vaginal sex in his truck. In July, Gutierrez and S.J. engaged in vaginal and oral sex on the trunk of his patrol car.
In October, detectives from the Miami police department’s Sexual Victim’s Unit contacted S.J. The detectives asked her if she had had sexual relationship with a police officer. S.J. initially denied having sex with any police officer, but eventually broke down and admitted to having sex with Gutierrez. S.J. kept a diary and was able to provide the dates on which she had engaged in sexual relations with Gutierrez.
The police then contacted Lazo and asked her to come to the police station. At the police station, an officer threatened to arrest Lazo’s brother if she did not cooperate with them, and another threatened her with arrest for contributing to the delinquency of a minor if she did not cooperate. Lazo’s attorney told her to cooperate with police and tell them what she knew. Lazo agreed to speak to Gutierrez over the phone and allowed the police to record the conversation. During the phone call, Gutierrez admitted that he had engaged in sexual relations with S.J. on three occasions.
About a month after making the controlled call to Gutierrez, Lazo learned that there were problems with the recording. The equipment that the police had used to record the call had malfunctioned, and there were gaps in recording. The police asked her to review the tape recording and a transcript that was made of the conver *324 sation. Lazo found that the transcript was an accurate representation of her conversation with Gutierrez.
Thereafter, Gutierrez was arrested and charged by information with thirteen counts of lewd and lascivious battery on a child less than sixteen years of age, a second degree felony. The information alleged that he engaged in sexual activity with S.J. between October 2002 and July 2003, when S.J. was older than twelve years of age but less than sixteen years of age.
Gutierrez filed a motion to suppress the controlled calls. At the hearing on the motion, Gutierrez argued that the calls should be suppressed because the state could not show that either he or Lazo voluntarily consented to the recording of the call. He further contended that the recording be suppressed because the recording was inaudible due to the faulty recording device.
Four witnesses testified at the suppression hearing: Lazo and three Metro-Dade Police officers, Detective Gilberto Viera, Commander Jose Alfonso, and Detective Joseph Fleres. Lazo testified that she was called by police regarding allegations of sexual conduct between S.J. and Gutierrez. At the time of the interview, she was 18 or 19 years old. She went into an interview room with four officers. She believed that she could be arrested if she did not tell the officers everything that she knew. Lazo said that although an officer had told her that she could go to jail, that officer was not involved in questioning her. She testified that none of the officers who actually interviewed her had threatened her. She gave the police a statement about her -knowledge of the relationship between Gutierrez and S.J., and she then agreed to make a controlled call. She felt a bit pressured to make the controlled call to Gutierrez, but felt that she was not forced.
Detective Alfonso testified that it was his decision to have Lazo make the controlled call. He said that after making her statement, she was getting ready to leave the police station when she was asked to come back and make the phone call. He could not recall if he was the one who asked her to make the call or if it was another officer. He described her demeanor as very cooperative and upbeat and that she was willing to make the calls. Alfonso said that Lazo never indicated that she did not want to make the calls.
Detective Fleres testified that Lazo consented to making the controlled call and never indicated that she did not want to do it. She did not object to the controlled call being recorded. Fleres met with Lazo approximately one month after the call was recorded and had her review the tape and the transcript.
Detective Gilberto Viera admitted that he told Lazo that she could have been arrested for contributing to the delinquency of a minor. Viera decided not to be involved in the interview with Lazo because he did not want their confrontation to influence her decision to give a statement. Viera was not present when Lazo consented to the controlled call. However, he was present when Lazo made the controlled call to Gutierrez.
Lazo listened to both the taped copy of the controlled call and to the enhanced copy of the call on compact disc. She said that both copies accurately depicted the conversation she had had with Gutierrez during the controlled call. She read the transcript of the controlled call and said that the transcript was an accurate recitation of the call.
The state contended that they had proven consent by the officers’ testimony that Lazo had agreed to the recording. The state also provided a signed affidavit that *325 Lazo had signed in 2005 which stated that she had consented to the recording of the call in 2003. The state argued that Lazo was not coerced into making a statement, making the controlled call or having it recorded because her consent was demonstrated by the fact that she had left the station after making the statement and returning to make the call at the detectives’ request. The state further argued that Lazo’s consent was proven by her testimony in court. The trial court found that the state had demonstrated consent by a greater weight of the evidence that Lazo had voluntarily given her consent to make the phone calls.
Gutierrez next argued that the recording of the calls should be suppressed because the tape was inaudible and unintelligible. The state asserted that Lazo had testified that the recording was an accurate depiction of the conversation and that Gutierrez’s answers could be heard. The trial court declined to listen to the recordings and denied the motion to suppress on the ground that the recording had inaudible portions.
Gutierrez proceeded to a jury trial. After the close of the state’s case, Gutierrez moved for a judgment of acquittal. The trial court dismissed Counts 3, 4, 7, 8, 10, 12 and 13 on the basis that the charges were duplicative and violated the prohibition on double jeopardy.
Gutierrez then testified on his own behalf. He denied meeting S.J. and Lazo on the day S.J. claimed they had met, and he denied ever having sexual contact with S.J. Gutierrez recalled the controlled call from Lazo. Lazo told him that she had been threatened with arrest for contributing for the delinquency of a minor. As Lazo continued to talk, Gutierrez realized that she was telling him that she was going to tell the police that he had been involved in a sexual relationship with S.J. Gutierrez claimed that he was shocked by this accusation, and he believed that this accusation would ruin his career, so his statements that he was “fucked” related to his fear that the police would arrest him first and investigate the claim after the fact.
Gutierrez claimed that his statement, “I am going to go to jail for this bullshit” referred to his anger over the fact that false allegations would end his career. He said that during the inaudible portions of the recording he was denying the allegations. He also said that because the recording was inaudible at times, it made appear as if he were answering questions that incriminated him. Gutierrez said at the time he was talking to Lazo on the controlled call, he was also monitoring his police radio and that there was static in the phone line. He claimed that when he answered Lazo’s question about how many times he and S.J. had “fucked,” he believed that she had said “talked.”
After Gutierrez testified and before the case was submitted to the jury, defense counsel moved to exclude a copy of the transcript of the controlled call from the jury room. The trial court denied Gutierrez’s motion. After the jury requested copies of the transcript, the trial court submitted five copies of the transcript to the jury. However, after a defense motion, the trial court retrieved the transcripts form the jury room.
The jury found Gutierrez guilty on Counts 1, 2, and 11 and acquitted him on Counts 5, 6, and 9. Gutierrez was sentenced to two consecutive 10 year terms of incarceration on Counts 1 and 2, and was sentenced to 15 years probation on Count 11 consecutive to Counts 1 and 2.
On appeal, the defendant alleges various bases to reverse the judgment in this case. We address only the two issues which we believe merit discussion. We *326 find the other issues either meritless or not preserved for appellate review. First, Gutierrez claims that the trial court erred in allowing the jury to view, during jury deliberations, the transcript of the tape of the controlled phone call between him and Lazo. The State concedes it was error under Martinez v. State, 761 So.2d 1074, 1084 (Fla.2000), for the trial court to permit the transcript to be given to the jury. However, it contends that any error was harmless.
While there are no Florida cases directly addressing the harmless error issue under the facts of a case such as this, the Eleventh Circuit has, in fact, addressed this exact issue. In United States v. Reed, 887 F.2d 1398, 1406-07 (11th Cir.1989), the court held that “[A]bsent a showing that the transcripts are inaccurate or that the specific prejudice occurred, there is no error in allowing transcripts to go into the jury room.” See also United States v. Brown, 872 F.2d 385 (11th Cir.1989); United States v. Williford, 764 F.2d 1493 (11th Cir.1985).
Here, although defense counsel objected to the use of the transcript in the jury room, he did not object based on the accuracy of the transcript. Thus, Gutierrez has not shown how he was prejudiced. A full review of the audio compact disc which was submitted into evidence reveals that Gutierrez’s statements are quite clear and accurately tracked in the transcript. The transcript reflects the audible portions, and the inaudible portions are accurately labeled as inaudible. There simply is no confusion as to what Gutierrez’s exact words were. The transcript was relevant to help the jury in listening to the recorded conversation, in which Gutierrez incriminated himself three times. The jury listened to the recording itself of the controlled phone call and was able to hear that Gutierrez admitted to having a sexual relationship with S.J. Consequently, the error was harmless.
Gutierrez further claims that the transcript was not properly authenticated. However, the Florida Supreme Court in Martinez v. State, 761 So.2d 1074 (Fla.2000), held that the actual participants to the conversation, or those who listened to or overheard the conversation as it was being recorded, may be able to verify the accuracy of the transcript so long as such persons can establish that the quality of the conversation that they overheard or listened to was better at the time they overheard it than the quality of the tape recording. Id. at 1088.
Here, Lazo was one of the participants in the controlled call. She testified that she reviewed the original recording, the enhanced recording, and transcript and that they were an accurate depiction of the conversation she had with Gutierrez. She even assisted in preparing the transcript. Clearly, this transcript was properly authenticated under MaHinez.[1]
Gutierrez further claims that the trial court erred in admitting into evidence the audio tape of the controlled phone call because Lazo did not give her consent to record the conversation. The State responds that Lazo’s consent was voluntary and that even though she testified that she felt a bit of pressure, she did not feel forced to make the call.
*327 A trial court’s determination as to the voluntariness of consent is presumed correct unless clearly erroneous. See Davis v. State, 594 So.2d 264, 266 (Fla.1992). The trial court is in the best position to evaluate the credibility of witnesses, and appellate courts are obligated to give the trial court great deference in making such findings of fact. See State v. Janes, 562 So.2d 740 (Fla. 3d DCA 1990).
Gonzalez cites to Jones for the proposition that the trial court improperly denied his motion to suppress with respect to this phone call. First, Jones is consistent with our decision today because in both cases we give proper deference to the trial court’s findings. The facts in Jones, as found by the trial court, are distinguishable from the facts before us. In Jones, the trial court found that the police coerced a friend of the defendant into making a telephone call which later was used in prosecuting the defendant. Id. at 741. The friend agreed that she had been pressured into assisting the police. Id. This Court held that the trial court had made a credible determination that the Mend had been coerced into making the call and that the conversation should be suppressed because her friend had not voluntarily consented to place the call. Id.
In contrast to what occurred in Jones, Lazo did not testify that she was coerced into assisting the police. She stated she felt a bit pressured to make the controlled call to Gutierrez, but Lazo also stated that she was not forced. During the motion to suppress hearing, the trial court was in the best position to view Lazo’s demeanor and testimony regarding the voluntariness of her consent. The trial court found that:
... by the greater weight of the evidence that there was a consent and that consent was valid and not coerced to all three portions of the phone calls. In fact, there may or may not have been [express consent] because the issue of consent can be defined and determined on the basis of all the circumstances and it is very clear her making the phone call was voluntary and not coerced.
We conclude that the trial court did not err in allowing the admission of the recorded call.
In sum, any error that occurred in allowing the transcript to go to the jury was harmless, and the trial court did not err in admitting the recorded call. With respect to the remaining issues on appeal, we affirm them without discussion. Based on the foregoing, Gutierrez’s conviction and sentence are affirmed.
Affirmed.

. Gutierrez further argues that the trial court gave no curative instruction after it recognized its error in allowing the transcript in the jury room, but defense counsel below did not request that a curative instruction be given. This issue can only be reviewed under a fundamental error analysis. Archer v. State, 613 So.2d 446 (1993). Failure to give a curative instruction when no such instruction was requested does not rise to the level of fundamental error. Martinez, 761 So.2d at 1088.