# Supreme Court of Florida

_____

No. SC15-1095
_____

**RAFAEL ANDRES,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

September 20, 2018

PER CURIAM.

Rafael Andres was convicted of one count of first-degree murder, one count of armed burglary with assault or battery, one count of first-degree arson, and one count of armed robbery for crimes that resulted in the death of Ivette Farinas, who was the occupant of an efficiency apartment in Miami where Andres was hired to perform renovation work. After the penalty phase, the jury recommended a sentence of death by a vote of nine to three. Following the jury's recommendation, the trial court imposed a sentence of death. This is Andres' direct appeal. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

For the reasons that follow, we affirm Andres' conviction for first-degree murder but vacate his death sentence because we cannot conclude that the *Hurst*[1] error was harmless beyond a reasonable doubt. Accordingly, we remand his case to the trial court for a new penalty phase.

**FACTS**

The evidence introduced at trial during the guilt phase established the following facts. On January 24, 2005, the day of the murder, Hazel Vaughn, the victim's neighbor, dropped her son off at school and returned home by 8:40 a.m. Vaughn was doing chores outside when she heard a female moan coming from the victim's efficiency. Later, while standing by her kitchen sink, Vaughn saw a male close the door to the victim's efficiency, using the top of the door instead of the doorknob, as he left the efficiency. Vaughn then saw the same male return to the efficiency and leave once more carrying a red container as he walked to a van. Shortly after the male left, Vaughn noticed thick smoke coming from the victim's efficiency and called 911 at approximately 12:50 p.m. In a photographic line up, Vaughn later identified Andres as the male she saw coming and going from the victim's efficiency the day of the murder.

---

1. *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017).

Firefighters responded to Vaughn's 911 call and arrived at the efficiency at 12:52 p.m. Upon entering the efficiency, Lieutenant Nelson Pagnacci saw flames and smoke coming from a bedroom to the left of the entryway. In front of him, in the kitchen area, Pagnacci saw the victim's body, which he dragged out of the burning efficiency. The victim was pronounced dead at the scene, and homicide detectives were called to respond.

The victim and her boyfriend, Alberto Ruiz, had lived together for approximately three years. For the first two years, the couple lived with Ruiz's parents at SW 74th Avenue and 16th Terrace in Miami. In April 2004, they moved about four blocks away to the efficiency at 1131 SW 74th Avenue.

The house on the property where the efficiency was located had been sold in November 2004, and the new owners, Zuzel Rodriguez and Jose Perez, began a series of renovations in early December, including electrical work, plumbing, painting, moving an air conditioning unit, plastering, and other repairs. They hired Andres to perform this work. When Andres came to work in the mornings, Rodriguez would give him the keys to the property, including the main house and the efficiency. The owners also moved the door to the efficiency, from the back of the house to a side alleyway; as a result, Andres had to move the outlet to the refrigerator and the refrigerator itself.

Ruiz drove a milk delivery truck every day except Wednesday and Sunday. On Wednesdays, Ruiz worked buying cars at auction. As a result, he would have between $200 and $2,000 in cash in the efficiency. The victim worked the afternoon shift at the La Carreta restaurant at Miami International Airport, returning home around 11 p.m. The victim brought home cash tips each night.

On the day of the murder, Ruiz left for work at 4 a.m. Andres arrived between 7 a.m. and 7:15 a.m., and Rodriguez gave him the keys. Rodriguez then left for work. Andres was scheduled to complete a full day of work solely in the main house.

That same day, the victim and her sister, Lisbeth Farinas, planned to run errands together. The victim was to pick up Lisbeth at their parents' house between 9 and 9:15 a.m., so Lisbeth anticipated that her sister would leave the efficiency no later than 9 a.m. By 9:30 a.m., Lisbeth, worried, began calling the victim. She continued calling the victim until noon without any answer. Lisbeth also tried calling Ruiz, finally reaching him at approximately 2 p.m. Ruiz also tried calling the victim but got no answer.

At 3:05 p.m., Ruiz's brother called Ruiz and told him that the area around the efficiency was blocked off and television cameras were there. Ruiz arrived at the scene around 5 p.m., and he was brought immediately to Miami-Dade Detective Enrique Chavary. Detective Chavary took Ruiz to a police station,

questioned him, took a DNA sample, and obtained consent to search the efficiency. At 6 p.m., the police called Lisbeth, and she went to the efficiency.

Not knowing that a fire or murder had occurred, Perez received a voicemail from Andres that afternoon. Although the voicemail was recorded at 12:47 p.m., Andres stated it was "12:15 p.m." and he was leaving Perez's house to finish some work at another home but would return to the Perez house later that afternoon. Perez never saw Andres again.

Angie Gonzalez, Perez's cousin, testified that she hired Andres to redo the flooring in her new home after meeting him through Perez. On January 20, 2005, four days before the murder, Gonzalez wrote Andres a check for $1,860, which constituted half of his fee for the project. On the day of the murder, Gonzalez went to her home and waited for Andres to arrive as scheduled, but he never arrived. Gonzalez called Andres three times to inquire about his absence; Andres returned her calls later that night to say he did not make it to her home due to a problem at the Perez house. Gonzalez called Andres three more times the next day, but he never returned her call. Gonzalez never saw Andres again, even though he left expensive tools and equipment at her home.

On the day of the murder, police called Andres, who agreed to meet with them at the police station the next morning. However, Andres did not appear as agreed and could not be found. On January 30, 2005, detectives located Andres

near a shopping mall on a public street in Miami. Police subsequently found Andres' van in a rural area with an empty red gasoline container inside.

An autopsy was performed on the victim's body at the medical examiner's office the day after the murder. The victim's cause of death was determined to be stab wounds to the chest and ligature strangulation. The victim's face and chin had large bruises and possibly an abrasion or scrape on the left side of her lower lip, consistent with being punched. The victim's chest had three stab wounds, which penetrated the chest cavity and right and left lungs, causing hemorrhaging. The victim's thighs were covered in a trail of blood, which changed directions as it ran down her legs, indicating the victim was upright when she sustained stab wounds to the chest but subsequently went to a kneeling position. The bruises and abrasions on the victim's left knee were also consistent with being forced to her knees. Ligature marks on the victim's neck and hemorrhages in her eyes confirmed that an object had been placed around her neck, and she struggled to defend herself while being asphyxiated.

The lack of carbon monoxide in the victim's body indicated that she died before the fire started. The medical examiner estimated that the victim suffered for up to thirty minutes before dying.

Crime scene officers and detectives discovered that the front door knob of the efficiency had been forcibly removed, and there was evidence of tampering

with the lock. An arson investigator from the Miami-Dade Fire Department determined that the fire was started with an ignitable liquid and an open flame on the bed in the bedroom. Crime scene officers impounded several pieces of evidence, including a bloody dishcloth found near the victim's body, which was confirmed to contain the presence of a mixture of the victim's and Andres' DNA. Police later obtained footage of Andres using the victim's debit card at several places, including Home Depot and Advance Auto Parts, on the day of and days following the murder. After a jury trial, Andres was found guilty as charged on all counts and adjudicated guilty consistent with the jury verdicts.

During the penalty phase proceedings, Detective Bruce Roberson, a former homicide detective for the City of Miami Police Department, testified that he interviewed Andres regarding his involvement in the 1987 second-degree murder of Linda Azcarretta. In that interview, Andres gave multiple accounts of how Azcarretta died but ultimately confessed that he stabbed her while they were both intoxicated from rock cocaine and later disposed of the knife.

Defense counsel presented several mitigation witnesses. Detective Roberson and Andres' 1987 attorney testified that Andres was remorseful when he confessed to killing Azcarretta. Other testimony from corrections officers, inmates, and family members indicated that Andres served as a prison trustee and informant,

understood the Bible, shared his food, taught others how to read, and was a good brother and father figure.

After the penalty phase, the jury recommended a sentence of death by a vote of nine to three. The trial court followed the jury's recommendation and imposed a death sentence.[2] This appeal followed.

## ANALYSIS

Andres raises twelve claims on appeal.[3] We address the guilt phase claims first, followed by the sufficiency of the evidence and Andres' claim for relief

---

2. The trial court found the following aggravating factors and assigned the noted weight: (1) Andres was previously convicted of a violent felony—the 1987 stabbing death of Linda Azcarretta (enormously great weight); (2) the capital felony was committed while Andres was engaged in the commission of or an attempt to commit burglary (some weight); (3) avoid arrest (very great weight); (4) the capital felony was committed for pecuniary gain (great weight); (5) the murder was heinous, atrocious, or cruel (extremely great weight). The court found no statutory mitigating circumstances but did find the following nonstatutory mitigating circumstances and assigned the noted weight: (1) Andres accepted responsibility for his 1987 murder (some weight); (2) Andres was a drug user (no weight); (3) Andres provided information to corrections officers (some weight); (4) Andres had a positive and respectful behavior towards correction officers (minor weight); (5) Andres volunteered as a trustee and performed his work with diligence (no weight); (6) Andres taught other inmates how to read and provided them with support (medium weight); (7) Andres led Bible study (some weight); (8) Andres had a positive impact on the lives of others (moderate weight); (9) Andres developed personal growth through Bible study (little weight); (10) Andres' family considered him to be a good father (minor weight); and (11) Andres helped care for his family and taught them how to read (medium weight).

3. Andres' claims on appeal are: (1) the State committed a discovery violation when it failed to disclose a material change in the testimony of Alberto Ruiz; (2) the trial court erred when it permitted the State to introduce hearsay; (3)

pursuant to *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Hurst*. Because we conclude that Andres is entitled to a new penalty phase pursuant to *Hurst*, we decline to address his other penalty phase claims.

## GUILT PHASE

### Alleged Discovery Violation

The first issue before this Court is whether the State committed a discovery violation when it failed to inform the defense of a material change in Alberto Ruiz's testimony from his deposition regarding his milk delivery route on the day of the murder and whether the trial court erred in failing to hold a *Richardson*[4] hearing regarding this change. This Court reviews the trial court's determinations regarding discovery violations for an abuse of discretion. *See State v. Evans*, 770 So. 2d 1174, 1183 (Fla. 2000).

---

the trial court erred in prohibiting Andres from pursuing certain lines of cross-examination; (4) the trial court erred when it admitted into evidence the fruits of the cell-site simulator search, namely DNA and other evidence collected from Andres; (5) the trial court erred in allowing the State to ask the medical examiner questions involving hypothetical scenarios; (6) the State engaged in misconduct during closing argument; (7) the trial court erred in preventing Andres from arguing lack of motive during closing arguments; (8) there is cumulative error in the guilt phase; (9) Andres is entitled to *Hurst* relief; (10) Detective Roberson's penalty phase testimony about his belief that Andres was guilty of his previous second-degree murder charge was inadmissible; (11) the trial court engaged in improper doubling of aggravating factors; (12) there was insufficient evidence to support the "avoid arrest" aggravator.

4. *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

Once a witness has given a recorded statement, the State must disclose any oral statement that constitutes a "material change" to the recorded statement. *Scipio v. State*, 928 So. 2d 1138, 1142 (Fla. 2006). We emphasized the importance of this prosecutorial obligation to the defense in *Scipio*:

> [T]he Fifth District was correct in its determination that the State committed a discovery violation when it failed to disclose to Scipio a material change in the State investigator's deposition statement. Further, the Fifth District's reliance on our decision in *Evans* is consistent with our case law stressing disapproval of trial by ambush.
>
> The State's calculated failure to inform the defense of the important and dramatic change in testimony of its medical examiner's investigator not only violated the prosecutor's duty not to strike "foul" blows, but undermined the very purpose of the discovery rules as set out by this Court in *Kilpatrick* [*v. State*, 376 So. 2d 386 (Fla. 1979),] and *Evans*, since the State was fully aware that the defense intended to rely heavily on the testimony of the State's investigator and would be completely surprised by the witness's changed testimony at trial.

928 So. 2d at 1145-46.

Failure to disclose an oral statement which constitutes a material change to a witness's recorded statement is a discovery violation that triggers a full *Richardson* hearing. *See, e.g.*, *Smith v. State*, 7 So. 3d 473, 505-06 (Fla. 2009); *Evans*, 770 So. 2d at 1179. While this Court has not specifically defined "material change," some are obvious. For example, in *Evans*, the "material change" was a change in the witness's testimony that transformed the witness from a witness who "didn't see anything" into the only eyewitness to the crime. 770 So. 2d at 1182. "During a *Richardson* hearing, the trial court must inquire as to whether the violation (1) was

- 10 -

willful or inadvertent; (2) was substantial or trivial; and (3) had a prejudicial effect on the aggrieved party's trial preparation." *Id.* at 1183. The harmless error analysis for a discovery violation is "whether there is a reasonable possibility that the discovery violation procedurally prejudiced the defense." *State v. Schopp*, 653 So. 2d 1016, 1020 (Fla. 1995). In other words, a discovery violation can be considered harmless only if the appellate court can determine beyond a reasonable doubt that the defense was not "materially hindered" by the discovery violation. *Id.*

During Ruiz's deposition, which took place approximately five years before trial and four years after the victim's death, the defense questioned Ruiz about his delivery schedule on the day of the murder. Ruiz replied, "That day specifically the closest I was to [the efficiency] was Coral Way and 74th Avenue—well, 75th because there was a detour and it becomes 75th." However, at some point during the State's trial preparations, Ruiz altered his original recorded statement from the deposition, asserting instead that he was not actually at the stated address on the day of the murder. As to this change, Ruiz explained that he was confused in the original deposition, leading him to testify about a different route, which he actually took on Tuesdays. Because the State did not disclose this change in Ruiz's testimony, the defense only discovered it when Ruiz was on the stand at trial.

The defense immediately objected and requested a *Richardson* hearing. The trial court, after hearing from both sides, held that the change in testimony was not material but, rather, a clarification of the testimony given at Ruiz's deposition. On the stand, Ruiz explained that he was confused by the questions at deposition, leading him to misspeak regarding the answer. Ruiz was a Spanish speaker; therefore, the deposition questions and his deposition testimony, as well as his trial testimony, were translated from English into Spanish and Spanish into English, respectively.

We conclude that the trial court did not abuse its discretion by failing to conduct a full *Richardson* hearing after determining that Ruiz's testimony at trial was merely a clarification of his prior deposition testimony. *See Knight v. State*, 76 So. 3d 879, 887-88 (Fla. 2011) (holding that a *Richardson* hearing was not required where the State ordered DNA comparisons, which indicated that the defendant could not be excluded, even though the defense planned to rely on the evidence).

Even if there was a discovery violation requiring a full *Richardson* hearing, while the trial court did not conduct a formal *Richardson* hearing, it did inquire when the State learned of Ruiz's change in testimony. Additionally, the defense was able to effectively show through cross-examination that Ruiz had conveniently changed his testimony on the eve of trial. There is no indication that

the State's actions were willful, that the change was "material," or that the change "materially hindered" Andres' trial preparation, as the most the defense could have accomplished was to impeach Ruiz with his prior inconsistent statement, as they did. Accordingly, we conclude that there was no procedural prejudice because there is no reasonable possibility that the discovery violation prejudiced the defense or that the defense was materially affected. *See Smith*, 7 So. 3d at 505-506.

For all these reasons, Andres is not entitled to relief on this claim.

**Hearsay**

Andres next argues that the trial court erred when it allowed the State to admit what he contends is hearsay testimony from the officers who investigated the case regarding (A) why they chose not to further investigate Ruiz as a potential suspect in the case and (B) the identity and death of Juan Baccalau.[5] "The admission of evidence is within the sound discretion of the trial court, constrained by the application of the rules of evidence and the principles of stare decisis." *Hayward v. State*, 183 So. 3d 286, 325 (Fla. 2015) (citing *Davis v. State*, 121 So. 3d 462, 481 (Fla. 2013)). Hearsay is defined as "a statement, other than one made

---

5. Andres also argued that the trial court erred in admitting Hazel Vaughn's testimony in relation to her belief about who started the fire. We do not address this claim because Andres concedes in his initial brief to this Court that this statement is not hearsay. Initial Br. of Appellant at 30.

- 13 -

by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (2016). Where testimony is not offered to prove the truth of the matter asserted, or where hearsay exceptions apply, the testimony can be deemed admissible. *Penalver v. State*, 926 So. 2d 1118, 1131-32 (Fla. 2006).

**A. Officers' Investigation into Ruiz as a Suspect**

Andres contends that the trial court improperly permitted officers to testify about why they chose not to further investigate Alberto Ruiz, the victim's live-in boyfriend, as a potential suspect in the case. Based on the specific facts of this case, we conclude that error, if any, was harmless beyond a reasonable doubt.

The testimony of both Sergeant McCoy, the supervising officer in the case, and Detective Gallagher, the lead detective, was presented by the State in response to the defense argument that detectives failed to investigate Ruiz. Specifically, on cross-examination the defense made Sergeant McCoy place dots on a map of every stop of Ruiz's milk route and then questioned whether he drove to each stop along the route as part of his investigation. This testimony was intended by the defense to paint the picture of an incomplete investigation into Ruiz as a potential suspect in the crime.

Additionally, Gallagher was called as a witness after the defense had already introduced its theory regarding an incomplete investigation during McCoy's

testimony. Thus, we conclude that the defense opened the door to the questions that Andres now contends were improper. *See State v. Baird*, 572 So. 2d 904, 908 (Fla. 1990) ("The testimony would have been admissible on redirect after the defense attempted, during cross-examination, to establish that Mr. Baird had been targeted for prosecution. . . . It was clear from the question eliciting the challenged response that the testimony was merely offered to rebut the defense's contention . . . .").

### B. Identity and Death of Baccalau

Andres next argues that Detective Chavary's testimony concerning the identity and death of Juan Baccalau[6] was inadmissible hearsay and violated his Sixth Amendment Confrontation Clause rights. U.S. Const. amends. VI, XIV; art. I, §§ 9, 16, Fla. Const.; *see Crawford v. Washington*, 541 U.S. 36, 50-51 (2004). This Court reviews a trial court's admission of evidence over a defense objection regarding the Confrontation Clause de novo. *See McWatters v. State*, 36 So. 3d 613, 637 (Fla. 2010).

Because none of Baccalau's statements were admitted against Andres, there can be no violation of the Confrontation Clause. *Id.* at 638; *see Crawford*, 541

---

6. Juan Baccalau was a landscaper who occasionally worked with Andres. During the defense's cross-examination of Jose Perez, the defense inquired about another individual, the "Dominican," who also worked on the job site, and attempted to insinuate that he may have committed the crime.

U.S. at 51. Chavary's testimony that the picture shown to him during trial accurately portrayed Baccalau was based on Chavary's personal observations, and he was subjected to cross-examination by Andres' counsel. Additionally, the death certificate was only used for the purpose of proving that Baccalau was deceased at the time of the trial. Accordingly, there was no Confrontation Clause violation.

Thus, Andres is not entitled to relief on this claim.

### Cross-Examination

Andres argues that the trial court improperly limited cross-examination of three witnesses: (A) Jose Perez, (B) Lisbeth Farinas, and (C) Alberto Ruiz. "Cross-examination of a witness is limited to the subject matter of the direct examination and matters affecting the credibility of the witness." § 90.612(2), Fla. Stat. (2017). The trial judge has wide discretion to impose reasonable limits on cross-examination. *See e.g.*, *Gosciminski v. State*, 132 So. 3d 678, 706 (Fla. 2013) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *Moore v. State*, 701 So. 2d 545, 549 (Fla. 1997).

#### A. Jose Perez

First, with respect to the testimony of Jose Perez, who owned the efficiency rented by the victim and Ruiz, Andres contends that he should have been permitted to ask Perez on cross-examination if there was a particular reason why Andres did not return to his home on the day of the murder, or any day thereafter, in order to

negate the inference of guilt made by the State.  Perez testified on direct examination for the State that Andres never returned to his home after the murder to complete the repair work following the fire.  Over defense objection, the prosecutor asked: "In the process of reconstructing your home and needing workers, [did] you ever hear from the defendant, about helping you with the reconstruction project[?]"  The trial court overruled the objection, and the prosecutor asked, "Did you ever see the defendant again?" Perez replied: "Negative."

In fact, Perez told Andres to not return.  However, on cross-examination, when the defense attempted to ask Perez why Andres never returned, the State objected, arguing this was inadmissible hearsay and beyond the scope of direct examination.  The prosecutor argued that the scope was narrowly limited by the State's question whether Perez had seen Andres again, not why, and also by the fact that the State had not asked about that precise phone call.  The trial court agreed and sustained the objection.

We conclude that even if there was error, it was harmless beyond a reasonable doubt.  The testimony presented at trial established that, in addition to not returning to Perez's home, Andres also failed to return to the Gonzalez home, where he left valuable tools.  Additionally, the line of questioning could have

opened the door to testimony from Perez explaining why he did not want Andres to return to his home, which would likely have been detrimental to Andres' case.

## B. Lisbeth Farinas

Next, Andres argues that the trial court abused its discretion when it limited the defense's cross-examination of the victim's sister, Lisbeth Farinas. The trial court allowed Lisbeth to testify that her sister and Ruiz had a "good relationship," but denied the defense the opportunity to explore that statement on cross-examination. Ultimately, the court allowed the defense to ask a single question: "Did you ever witness a verbal argument between them," to which Farinas responded, "No."

The trial court limited the cross-examination because Lisbeth testified that she never saw any violence in the relationship and that the victim and Ruiz had a good relationship. Even if the State opened the door to questioning about the victim's and Ruiz's relationship, Lisbeth's response that she did not know of any issues in their relationship ended the inquiry. No evidence, beyond the hearsay testimony of the victim's coworker, could have been used by the defense to impeach Lisbeth on this issue. Thus, we conclude that the trial court's ruling as to the cross-examination of Lisbeth Farinas was not an abuse of discretion.

## C. Alberto Ruiz

Finally, Andres argues that the trial court improperly limited the cross-examination of Ruiz, the victim's boyfriend. Andres contends that the trial court's statements forced him to abandon his right to cross-examine Ruiz about this matter. We disagree.

At trial, Ruiz testified that he did not recall Andres doing any work inside the efficiency. The defense attempted to ask Ruiz on cross-examination about his prior statement to detectives that Andres had done work in the efficiency near the bed. At sidebar, the trial court cautioned the defense about the potential implications of asking Ruiz about the work done inside the efficiency, indicating that it could lead to the State questioning Ruiz about his belief that Andres had previously burglarized the efficiency.

The trial court cautioned the defense about the potential implications of pursuing a particular line of questioning. In turn, the defense made the strategic choice to limit cross-examination on this matter to minimize any potential prejudice to Andres.

Thus, Andres is not entitled to relief on this claim with respect to any of the witnesses.

**Cell-Site Simulator Search**

Andres next argues that the trial court erred when it denied his motion to suppress evidence that the police obtained, following their use of a cell-site

simulator search (often referred to as "Stingray") on Andres' mobile phone.[7] On

January 26, 2005, detectives obtained a pen register[8] and "trap and trace" order for

Andres' cell phone pursuant to section 934.33, Florida Statutes (2005). On

January 27, the police obtained a warrant to search Andres' body, home, and van.

The State used a cell-site simulator to locate Andres and serve the warrant. Once

they found him, the officers took Andres into custody, photographed his body, and

took DNA samples. The photographs and samples were introduced in evidence at

trial.

Andres filed a motion to suppress statements and evidence obtained. In his

motion, Andres requested that the court suppress Andres' statements, the

---

7. We take notice of the United States Supreme Court's recently issued decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). However, we conclude that its holding is not applicable to this case, where officers used real-time cell-site location information to locate Andres for the purposes of executing the warrant. *See id.* at 2220 ("Our decision today is a narrow one. We do not express a view on matters not before us: real-time CSLI or 'tower dumps' (a download of information on all the devices that connected to a particular cell site during a particular interval.)").

8. "A 'pen register' records the telephone numbers dialed from the target telephone and a 'trap and trace device' records the telephone numbers from incoming calls to the target telephone." *Tracey v. State*, 152 So. 3d 504, 506 (Fla. 2014). In order to obtain an order for a pen register or trap and trace, the State need only present "specific and articulable facts showing that there are reasonable grounds to believe the contents of a wire or electronic communication or the records of other information sought are relevant and material to an ongoing criminal investigation." § 934.23(5), Fla. Stat. (2005). There is no requirement of probable cause.

photographs taken of Andres that day, and the initial taking of Andres' DNA. The motion was denied. During jury selection, Andres moved for the trial court to reconsider and suppress all the evidence from the body warrant. Andres argued that the law changed under *Tracey v. State*, 152 So. 3d 504 (Fla. 2014), which was decided in October 2014 after the trial court's initial ruling in this case. Andres claimed that a probable cause warrant was required at the time the cell-site simulator was used to find Andres and no exceptions to the warrant requirement applied.

In *Tracey*, law enforcement learned from a confidential informant that Tracey had obtained multiple kilograms of cocaine to distribute and used Tracey's Metro PCS telephone number to communicate with the confidential informant. 152 So. 3d at 506-07. Based only on those factual allegations, officers obtained an order authorizing the installation of a "pen register" and "trap and trace device" on Tracey's cell phone. *Id.* at 506. This Court held that the evidence obtained as a result of the search should be suppressed because probable cause did not support the search, and no warrant based on probable cause authorized the use of Tracey's real-time cell-site location information to track him. *Id.* at 526.

Andres' reliance on *Tracey* is misplaced. In this case, as opposed to *Tracey*, the police had a warrant, obtained after providing probable cause, to seize and

search Andres' body, home, and van. The evidence obtained—Andres' DNA and photographs of his body—was well within the scope of the warrant.

Even if the use of the cell-site simulator was improper, Andres would still not be entitled to relief. *See Davis v. United States*, 564 U.S. 229, 232 (2011) ("[S]earches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."); *Fitzpatrick v. State*, 900 So. 2d 495, 514 (Fla. 2005) ("[E]ven if there was police misconduct in pressuring Fitzpatrick to provide a blood sample, the DNA evidence was properly admitted because Fitzpatrick's DNA ultimately would have been discovered.").

Thus, Andres is not entitled to relief on this claim.

## Questioning of Medical Examiner

Andres next argues that the State improperly elicited testimony from the medical examiner, Dr. Lew, outside of his expertise through the use of certain questions that asked Dr. Lew to contemplate hypothetical scenarios. The party requesting the testifying expert has the burden of laying a foundation with qualifying information about the expert's professional background. *See Evans v. State*, 808 So. 2d 92, 102 (Fla. 2001).

When reviewing the trial court's admission of an expert witness's testimony, this Court applies an abuse of discretion standard. *See Calloway v. State*, 210 So. 3d 1160, 1182 (Fla. 2017). The State qualified Dr. Lew, the deputy chief medical

examiner, as an expert witness who had sufficient knowledge and training within the field of pathology. The medical examiner conducted an extensive review of all the medical documents and photographs concerning the victim's case file. Accordingly, the State laid a proper foundation to allow Dr. Lew to provide an opinion on the cause and manner of the victim's death. This Court has required that the party questioning the expert must base any hypothetical on "facts that are supported by evidence which has been introduced at trial." *Smith*, 7 So. 3d at 501. That was the case here. Indeed, when the State attempted to go beyond the scope of the evidence presented, the trial court sustained the defense's objections.

Thus, Andres is not entitled to relief on this claim.

### State's Closing Argument

Next, Andres raises several claims of impropriety during the prosecutor's guilt phase closing argument: (A) burden-shifting, (B) denigrating the defense, (C) misstating the law, and (D) inflammatory remarks. Andres also argues that the cumulative effect of the improper remarks amounted to harmful error.

As to improper remarks during the prosecutor's closing argument, this Court explained in *Cardona v. State*, 185 So. 3d 514 (Fla. 2016):

> We review trial court rulings regarding the propriety of comments made during closing argument for an abuse of discretion. *Salazar v. State*, 991 So. 2d 364, 377 (Fla. 2008). Where the comments were improper and the defense objected, but the trial court erroneously overruled defense counsel's objection, we apply the harmless error standard of review. *See Snelgrove v. State*, 921 So. 2d 560, 568 (Fla.

2005); *Doorbal v. State*, 837 So. 2d 940, 956-57 (Fla. 2003). This standard involves placing "the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *Ibar v. State*, 938 So. 2d 451, 466 (Fla. 2006) (citing *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986)).

*Id.* at 520. Where the trial court sustains the objection, it is incumbent upon counsel to either request a curative instruction or move for a mistrial to preserve the error on appeal. Conversely, when an improper comment is made, objected to by counsel, and sustained by the trial court and corrected by the issuance of a curative instruction, this Court has held that the proper standard of review governing the denial of a motion for a mistrial is abuse of discretion. *Chamberlain v. State*, 881 So. 2d 1087, 1098 (Fla. 2004); *Rivera v. State*, 859 So. 2d 495, 512 (Fla. 2003); *Anderson v. State*, 841 So. 2d 390, 403 (Fla. 2003).

**A. Improper Burden Shifting**

As to improper burden shifting, Andres contends that the prosecutor made various comments throughout the rebuttal closing argument, including "No evidence that this defendant is not guilty;" "[W]hat is on the not guilty side? Nothing;" "Innocent people don't need alibis," and "Where is evidence? Where is the evidence before you?" Andres argues that the prosecutor emphasized this argument by using a visual aid which depicted "The Scales of Justice." The visual aid was a poster board approximately two feet by three feet with a depiction of a

- 24 -

balance scale. The arms of the scale were in equipoise. On the side marked "Guilty," the State listed thirteen pieces of evidence, above it writing: "EVIDENCE, EVIDENCE." On the "Not Guilty" side of the scale, the State wrote: "Speculation, guess."

The trial court sustained the defense objection to the comment—"What is on the not guilty side? Nothing,"—and gave a curative instruction requiring that the jury disregard the previous statement. However, the court overruled objections to other comments, including "Where is evidence? Where is the evidence before you?" The trial court also overruled the defense's objection to the State's use of the "scales of justice" example.

The State made all of these comments referring to the lack of evidence in the defense's case in rebuttal after the defense made numerous comments relating to the State's lack of evidence, including: "We have brought certain evidence about other people just so that you would have a better understanding of the police investigation here. I suggest to you that the prosecutor's entire case is internally inconsistent."; "Jurors cannot, I hope, base your verdict on assumption, on guesswork and on speculation"; and "We know that there [were] problems with this investigation, Detective Gallagher admitted from the beginning and it was agreed to that he lost some evidence." Thus, in making the above comments, the State was calling the jury's attention to the fact that its case against Andres was

supported by the evidence presented, whereas Andres' insistence that he was innocent was not.

While the State cannot comment on the defendant's failure to present evidence, there is no impropriety in observing, in response to arguments made by the defense, that the defense's theory of this case is not supported by actual evidence. *See Barwick v. State*, 660 So. 2d 685, 694 (Fla. 1995) (classifying the statement, "what in this courtroom, what evidence, what fact, what testimony, what anything have you heard . . . would create a reasonable doubt in your mind what he has done, what he is guilty of. Nothing," as invited response where defendants used closing to try to place doubt in jury's mind that prosecution was hiding evidence), *receded from on other grounds by Topps v. State*, 865 So. 2d 1253, 1258 n.6 (Fla. 2004); *Dufour v. State*, 495 So. 2d 154, 160-61 (Fla. 1986) (holding that the statement, "[Y]ou haven't . . . heard any evidence that . . . Dufour had any legal papers" did not constitute reversible error as the statement "fell into the category of an 'invited response' by the preceding argument of defense counsel concerning the same subject"). Accordingly, the trial court did not err in overruling the defense's objections to these comments.

## B. Denigrating the Defense

Next, Andres argues that the prosecution denigrated the defense by persistently ridiculing the defense's case as "speculation," "guessing," and

"coincidences," and warning jurors the defense was trying to "distract" them. The prosecutor revived this theme in her rebuttal closing.

This Court has held that arguments accusing the defense of trying to "distract" or confuse jurors are improper. *See, e.g.*, *Cardona*, 185 So. 3d at 523-25. In *Cardona*, the prosecutor accused the defense of using "diversionary tactics" and argued that the defense was trying to "cloud" and "muddle" the issues. *Id.* at 523. The comments in this case do not rise to the same level of impropriety as those in *Cardona*. In *Cardona*, the prosecutor made other significantly more prejudicial statements that undermined the jury's ability to render a fair and impartial verdict. Additionally, in this case, as opposed to *Cardona*, the trial court sustained a number of objections to the comments. Thus, we conclude there was no error.

## C. Misstatement of the Law

Andres next argues that the State misstated the law when it repeatedly told the jury that an intentional killing is necessarily first-degree murder. Specifically, the prosecutor stated that second-degree murder is "where you intend to do an act but you don't intend to kill them." Reading the statements in the proper context, it is clear that the prosecutor attempted to distinguish the premeditation element of first-degree murder when she stated "when you think about the intent to kill" and second-degree murder when she stated it is "done from ill-will, hatred, spite . . .

you didn't think about it before you did it." Importantly, in response to a sustained objection, the trial court informed the jury that it would properly instruct the jury as to the law. Thus, in context, with the trial court's sustained objection and explanation of the case law when instructing the jury, any error was harmless beyond a reasonable doubt. *See Almeida v. State*, 748 So. 2d 922, 927 (Fla. 1999).

**D. Inflammatory**

Next, Andres argues that the following comments were improper and inflammatory. First, the prosecutor argued during closing arguments that "Andres took [the victim] to the torture chair" and painted an emotional picture of the victim "beginning to choke on her own blood." Additionally, the State referred to Ruiz's comment on the stand that his "life was ruined that day." The defense objected, arguing that such comments were inflammatory. The judge sustained the first objection but overruled the second and third. In *Cardona*, we explained:

> [A] bedrock principle of our criminal justice system is that every effort must be made in any trial—regardless of whether the case involves such heart-wrenching circumstances—to ensure that the jurors base their decision, not on sympathy for the victim or prejudice against the defendant, but solely on the facts elicited during trial and the law instructed by the trial court.

185 So. 3d at 519.

As to the first comment regarding the "torture chair," the trial court properly sustained the defense's objection, and it was not an abuse of discretion to deny the defense's motion for a mistrial. Next, with respect to the State's comment that the

- 28 -

"victim began to choke on her own blood," this statement was not inflammatory, but, rather, an accurate depiction of what happened to the victim based on the medical examiner's testimony. Finally, with respect to the State's comments regarding Ruiz, again, the State was only repeating Ruiz's testimony from earlier in the trial. Accordingly, we conclude that the trial court did not err with respect to these comments.

## E. Cumulative Error

Finally, Andres argues that the cumulative effect of all of the prosecutor's improper comments warrants a new trial. In a case such as this, where all of the improper comments were objected to, this Court considers whether, when taken together, the State can prove that the prosecutor's improper comments were harmless beyond a reasonable doubt. *See DiGuilio*, 491 So. 2d at 1135-36. The Court does "not examine allegedly improper comments in isolation." *Card v. State*, 803 So. 2d 613, 622 (Fla. 2001). A prosecutor's conduct "mandates reversal where a prosecutor 'exceed[s] the bounds of proper conduct and professionalism and provide[s] a "textbook" example of overzealous advocacy.' " *Cardona*, 185 So. 3d at 516 (quoting *Gore v. State*, 719 So. 2d 1197, 1202 (Fla. 1998)).

The prosecutor in this case made improper comments during closing arguments, to which the trial court properly sustained the defense's objections. As to the objected-to comments for which the trial court overruled the objections, the

- 29 -

State made comments relating to the lack of evidence supporting the defense's theory of the case and comments tending to denigrate the defense. However, the cumulative effect of all of the comments was harmless beyond a reasonable doubt. When the trial court sustained the defense objections, the State backed away from the argument. Additionally, no single improper statement or line of argument became the theme or main focus of the State's closing arguments, as the "justice for Lazaro" argument was in *Cardona*. *See Cardona*, 185 So. 3d at 521-22. Accordingly, some of the State's actions and comments, though unprofessional and questionable, did not rise to the same level of impropriety exhibited in *Cardona*.

Thus, Andres is not entitled to relief on this claim.

### Defense Closing Arguments

Andres next argues that the trial court improperly prevented defense counsel from arguing lack of motive as a basis for reasonable doubt and inferences from the evidence during closing arguments.

First, as to Andres' contention that the trial court improperly prevented him from arguing lack of motive, Andres has mischaracterized the trial court's ruling. Defense counsel stated: "Questions about that, that means that you have doubts." By arguing that if the jury had questions as to Andres' motive to commit the crime, they could not find Andres guilty of the crime because there is a reasonable doubt as to whether Andres committed the crime, defense counsel improperly

- 30 -

characterized motive as an element of first-degree murder. Therefore, the State's objection was properly sustained by the trial court. Notwithstanding, defense counsel could have continued to argue this point, rephrasing to clarify that motive is not an element of first-degree murder that the State must prove beyond a reasonable doubt.

Next, Andres argues that the trial court improperly prevented defense counsel from arguing inferences drawn from the evidence. This argument is without merit. It is true that counsel may argue against the State's case "using all reasonable inferences that might be drawn from the evidence." *Rogers v. State*, 844 So. 2d 728, 733 (Fla. 5th DCA 2003). However, to be reasonable, the "inferences drawn from admitted or proven facts must logically flow from the facts so admitted or proved. An illogical or unreasonable inference does not have the force of evidence" and will not be admissible. *Miller v. State*, 75 So. 2d 312, 315 (Fla. 1954). As none of the inferences defense counsel attempted to use were based on the facts in evidence, we conclude that the trial court did not abuse its discretion.

Thus, Andres is not entitled to relief as to this claim.

## Guilt Phase Cumulative Error

Andres next argues that he is entitled to relief based on the cumulative error

in the guilt phase of his trial. As to guilt phase cumulative error, we have

explained:

> Having concluded that multiple errors occurred in this case, we
> proceed to consider the cumulative effect of those errors to determine
> whether those errors are harmless. *See McDuffie*[ *v. State*], 970 So. 2d
> [312,] 328 [(Fla. 2007)] (conducting a cumulative harmless error
> analysis where multiple preserved errors occurred). Harmless error
> analysis places the burden upon the State, as beneficiary of the errors,
> to prove there is "no reasonable possibility that the error contributed
> to" the defendant's conviction. *DiGuilio*, 491 So. 2d at 1138. As we
> have repeatedly stressed, the harmless error test "is not a sufficiency-
> of-the-evidence, a correct result, a not clearly wrong, a substantial
> evidence, a more probable than not, a clear and convincing, or even an
> overwhelming evidence test" but the "focus is on the effect of the
> error on the trier-of-fact." *Id.* at 1139.

*Evans v. State*, 177 So. 3d 1219, 1238 (Fla. 2015).

In this case, we concluded that the trial judge impermissibly limited Andres'

ability to cross-examine Jose Perez regarding why Andres failed to return to

Perez's home, and that the prosecutor made a handful of objectionable improper

closing arguments, for which several objections were sustained. However, we also

concluded that both of these errors were harmless beyond a reasonable doubt.

Ultimately, we conclude that even when considered cumulatively, these errors

were harmless beyond a reasonable doubt.

Thus, Andres is not entitled to relief on his claim of cumulative error.

## Sufficiency of the Evidence

Although Andres does not contest the sufficiency of the evidence, this Court has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed. *See Jones v. State*, 963 So. 2d 180, 184 (Fla. 2007); Fla. R. App. P. 9.142(a)(5) ("[I]n death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief."). "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Simmons v. State*, 934 So. 2d 1100, 1111 (Fla. 2006) (quoting *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001)). Evidence is insufficient "in a circumstantial evidence case if the [S]tate fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." *Orme v. State*, 677 So. 2d 258, 262 (Fla. 1996) (quoting *State v. Law*, 559 So. 2d 187, 188 (Fla. 1989)).

The record contains sufficient evidence to support Andres' conviction for the first-degree murder of Ivette Farinas. The evidence at trial established that Andres bound the victim with tape, forced her on her knees, stabbed her, and strangled her with the cord to a rice cooker. The victim's next-door neighbor

observed Andres coming back and forth from the victim's efficiency and saw Andres holding a red container shortly before a fire was set to the victim's efficiency.

The evidence also establishes that Andres called the owner of the efficiency, the victim's landlord, claiming he was calling at a different time than actually recorded, to tell him that he would return later after he finished work at another home. Andres never went to the other home, nor did he retrieve expensive items he left behind at that home. Andres was then observed on video at Home Depot purchasing items with the victim's debit card and at Bank Atlantic withdrawing money from the victim's checking account. Andres subsequently checked into the Miccosukee Resort to gamble and later abandoned his van in a remote, rural location. Inside the van, among other things, was a red container similar to the one seen by the victim's next-door neighbor being carried by Andres the day of the murder. Last, and most notably, a mixture of the victim's and Andres' DNA was found on a bloody dishcloth close to the victim's body inside the efficiency.

Thus, competent, substantial evidence supports Andres' conviction for the first-degree murder of Ivette Farinas.

### *HURST*

Andres' sentence of death was imposed in violation of the Sixth Amendment to the United States Constitution pursuant to the United States Supreme Court's

holding in *Hurst v. Florida* and article I, section 22, of the Florida Constitution, as this Court fully explained in *Hurst*. Specifically, in *Hurst v. Florida*, the Supreme Court held that Florida's capital sentencing scheme, under which Andres was sentenced to death, was unconstitutional, stating: "The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." 136 S. Ct. at 619.

On remand, this Court held that *Hurst* error occurs when "the judge rather than the jury ma[kes] all the necessary findings to impose a death sentence." 202 So. 3d at 67. This Court then established the test for determining whether a *Hurst* error is harmless beyond a reasonable doubt, which we summarized in *Davis v. State*, 207 So. 3d 142 (Fla. 2016): "As applied to the right to a jury trial with regard to the facts necessary to impose the death penalty, it must be clear beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravating factors that outweighed the mitigating circumstances." *Id.* at 174; *see Hurst*, 202 So. 3d at 65-68. We turn now to review whether the *Hurst* error in Andres' case was harmless beyond a reasonable doubt.

The trial court imposed Andres' death sentence following the jury's nonunanimous recommendation of death by a vote of nine to three. This Court is unable to determine or speculate why the dissenting jurors voted for a life sentence. This Court cannot determine whether these jurors did not find that

- 35 -

sufficient aggravating factors were proven to impose a sentence of death, that the aggravation did not outweigh the mitigation, or, for some other reason, determined that death was not an appropriate sentence. Thus, the *Hurst* error was not harmless beyond a reasonable doubt. Accordingly, we vacate the sentence of death and remand for a new penalty phase.

## CONCLUSION

For the reasons stated above, we affirm Andres' conviction but vacate his death sentence and remand his case for a new penalty phase.

It is so ordered.

LEWIS, QUINCE, and LABARGA, JJ., concur.
LAWSON, J., concurs specially with an opinion.
PARIENTE, J., concurs in part and dissents in part with an opinion.
CANADY, C.J., and POLSTON, J., concur in result only as to the convictions and dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., concurring specially.

I fully concur in that portion of the opinion affirming Andres's conviction, but concur specially in the decision to reverse the sentence of death pursuant to *Hurst v. State*, 202 So. 3d 40, 68 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017). *See Okafor v. State*, 225 So. 3d 768, 775-76 (Fla. 2017) (Lawson, J., concurring specially).

PARIENTE, J., concurring in part and dissenting in part.

I concur that Andres is entitled to a new penalty phase pursuant to *Hurst*.[9] However, I dissent as to the failure to grant Andres a new trial based on cumulative error, which hindered Andres' ability to effectively present the defense theory that the victim's live-in boyfriend, Alberto Ruiz, was actually responsible for the victim's death. That defense was significantly undermined by four errors in this case: (1) the State's failure to disclose Ruiz's material change in testimony as to his alibi, (2) the trial court's error in allowing the State to repeatedly introduce the hearsay testimony of Sergeant McCoy and Detective Gallagher that they did not consider Ruiz a suspect, (3) the trial court's error in not allowing the defense to inquire on cross-examination why Andres did not return to the Perez home, and (4) the State's improper comments during closing arguments. When considered cumulatively, it is impossible to conclude that these errors, which were properly preserved in the trial court, were harmless beyond a reasonable doubt.

**Discovery Violation**

First, the State improperly failed to disclose the material change in Alberto Ruiz's testimony regarding his delivery route on the day of the murder. At trial and in deposition, Ruiz stated that he would sometimes stop at his home while

_____

9. *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017).

making deliveries. During the deposition taken in 2009, Ruiz responded that the closest he was to the crime scene on that day was Coral Way and 74th or 75th Avenue, which was relatively close to the efficiency. However, during trial in 2014, Ruiz changed his earlier testimony, explaining that he had misspoken and, instead, was on a different delivery route, which did not take him close to his home.

The defense immediately objected and asked to address the court regarding the change in testimony. At that point, the trial court was obligated to conduct a *Richardson*[10] hearing. *See Smith v. State*, 7 So. 3d 473, 505 (Fla. 2009); *Scipio v. State*, 928 So. 2d 1138, 1146 (Fla. 2006). The State admitted that it was aware of the change in Ruiz's testimony but contended that it had no duty to disclose the change to the defense because it was not material. In this Court, the State argues that Ruiz's change in testimony merely clarified a "crummy question" by the defense at the deposition. I disagree.

The fact that the State was aware of this change before trial but failed to disclose it, even though the deposition occurred over five years before trial, is inexcusable. Additionally, the majority accepts without further discussion the State's argument that Ruiz's new testimony at trial was a mere clarification.

10. *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

However, this argument cannot survive the facts in the record. Defense counsel prefaced her deposition questions by referring to "the day [the murder] happened." She called Ruiz's attention to his schedule for that day, which bore the date January 24, 2005, on its face. Asked if his route took him near the efficiency, Ruiz referred to "that day specifically." Thus, the transcript of the deposition clearly shows that Ruiz was not confused as to either the defense question or his answer.

The trial court's failure to conduct a full *Richardson* hearing, in which the trial court must inquire as to whether the violations were "inadvertent or willful," "trivial or substantial," and "most importantly, what effect, if any did it have upon the ability of the defendant to properly prepare for trial" hinders this Court's ability to conduct a proper harmless error analysis. *Richardson*, 771 So. 2d at 775. As the majority states, a discovery violation can be considered harmless only if the appellate court can determine beyond a reasonable doubt that the defense was not prejudiced by the violation. Majority op. at 11.

Prior to *State v. Schopp,* 653 So. 2d 1016 (Fla. 1995), a failure to conduct a *Richardson* hearing was per se reversible. *Id.* at 1019-20. However, even with *Schopp*, this Court adopted an exacting standard for failures to conduct a *Richardson* hearing, which involves a consideration of whether there was procedural prejudice to the defendant:

> In determining whether a *Richardson* violation is harmless, the appellate court must consider whether there is a reasonable possibility

that the discovery violation procedurally prejudiced the defense. As used in this context, the defense is procedurally prejudiced if there is a reasonable possibility that the defendant's trial preparation or strategy would have been materially different had the violation not occurred. Trial preparation or strategy should be considered materially different if it reasonably could have benefited the defendant. In making this determination every conceivable course of action must be considered. If the reviewing court finds that there is a reasonable possibility that the discovery violation prejudiced the defense or if the record is insufficient to determine that the defense was not materially affected, the error must be considered harmful. In other words, only if the appellate court can say beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation can the error be considered harmless.

*Id.* at 1020-21.

Because a full *Richardson* hearing was not conducted, the Court is left to speculate as to the answers to these critical inquiries. The majority opinion states that the State's failure to inform the defense was not willful. But it is impossible to reach that conclusion, because that is exactly the type of inquiry required in a *Richardson* hearing, which was not conducted in this case.

The defense theory of the murder in this case centered upon focusing the jury's attention on Ruiz, the victim's live-in paramour, as the prime suspect. Ruiz's testimony regarding his delivery route during the deposition buttressed this theory by placing him near the scene of the crime around the time the crime was likely committed. Thus, the change in testimony was material to the defense case, and any knowledge in regard to how the defense strategy would have changed if they had known about this "clarification" before trial would be pure speculation.

Further, the majority opinion's reliance on *State v. Knight*, 76 So. 3d 879 (Fla. 2011), is unpersuasive. In *Knight*, this Court held that a *Richardson* hearing was not required where the State ordered further DNA comparison testing without giving any notice to the defense. *Id.* at 887-88. Ultimately, this Court held that there was no discovery violation because the defense was actually in receipt of all of the evidence, but merely "complained of having the evidence interpreted differently by two experts." *Id.* at 888. By contrast, in this case, the State admittedly knew before trial that Ruiz was going to give testimony that directly contradicted his earlier statements in the deposition and chose not to inform the defense regarding this change. Thus, the State knowingly withheld a key piece of evidence with respect to the defense theory of the crime.

Ruiz's change in testimony did not turn him into an eyewitness to the crime, but it did undermine the defense theory of the case by allowing him to deny he was near the scene of the crime at the time of the victim's murder. Although the defense was able to impeach Ruiz on the stand with his prior contradictory statement, that change in strategy occurred at the last minute while the witness was testifying rather than through a reasoned decision made in advance of trial. Accordingly, I would conclude that the State's nondisclosure was material, and the trial court's failure to conduct a full *Richardson* hearing was not harmless beyond a reasonable doubt.

**Hearsay Testimony**

Next, with respect to the improper hearsay statements that the trial court allowed, I also respectfully disagree with the majority's conclusion. The core guarantee of the constitutional right to confront witnesses is that the government cannot use the hearsay statements of nontestifying witnesses against a criminal defendant at trial. *See* U.S. Const. amends. VI, XIV; art. I, §§ 9, 16, Fla. Const.; *Crawford v. Washington*, 541 U.S. 36 (2004). Where testimony creates the clear inference that a nontestifying witness furnished information, it is inferential hearsay subject to the same rules. *See, e.g.*, *Keen v. State*, 775 So. 2d 263, 272 (Fla. 2000).

In this case, the trial court permitted the officers who investigated the crime to testify, over defense objection, as to their opinion regarding whether Ruiz committed the crime. Their testimony was based largely upon information Detective Chavary gathered during his interview with Ruiz—in other words, the opinion testimony was based purely on hearsay. I cannot agree with the majority opinion that this testimony was permissible. Majority op. at 14-15.

The lead officer, Sergeant McCoy, testified first, over repeated hearsay objections by the defense. The trial court overruled most of the objections based on the State's arguments that the testimony fit into either the "present sense impression" or "course of the investigation" exceptions to the rule against hearsay.

But, as the defense repeatedly pointed out at trial, there is no course-of the-investigation exception. *See Keen*, 775 So. 2d at 274 (rejecting the argument that similar testimony was admissible to "show a sequence of events"); *State v. Baird*, 572 So. 2d 904, 907 (Fla. 1990) (rejecting the argument that such testimony was proper to prove a detective's "motive for investigating [the defendant]," or to "present a logical sequence of events").

Arguing in support of a mistrial, defense counsel stated:

[W]e have heard a lot from this witness about what he learned, what came to be known to him. And whatever he was told, all of that, has been hearsay. We have been objecting. Some have been sustained, a lot more overruled. And what I want to call to the Court's attention, that's what the State is doing, with this witness. They are using this witness, to bring in hearsay, from other detectives, about what happened outside of his presence.

The defense further noted the fallacy of the State's argument that once the detective has personal knowledge of the information, it is no longer considered hearsay:

The detective could come in and say, well, I learned the defendant was guilty. I learned that a witness saw him do that.

In other words, the defense correctly explained that police officers cannot become conduits for what others have observed or investigated.

Although the trial court denied the motion for mistrial, the trial court granted the defense's motion in limine that the "State will not bring out hearsay, through the guise of what a detective will learn." However, despite the motion being

granted during the direct examination, the State then utilized another tactic—

stating that the officer could testify based on "personal knowledge" without ever

exploring how Sergeant McCoy, who only participated in the investigation in a

supervisory capacity, gained the "personal knowledge."

Specifically, the prosecutor asked McCoy over defense objection:

> [MS. LEVINE]:  Did you send Detective Chavary to interview Alberto Ruiz?
>
> A.  Yes.
>
> [MS. LEVINE]:  *Subsequent to that interview, was Alberto Ruiz a suspect in this case*?
>
> MS. GEORGI:  Objection.  Calls for hearsay.
>
> THE COURT:  Overruled. You can answer, sir, if you have personal knowledge.
>
> THE WITNESS:  No.  He was not a suspect.

(Emphasis added.)  Additionally, during Detective Gallagher's testimony the

following exchange occurred:

> [MS. LEVINE]:  I would like to talk to you specifically about Alberto Ruiz.  Did you, sir, you, ever speak to him personally?
>
> A.  No, I did not.
>
> [MS. LEVINE]:  Who did you assign that to?
>
> A.  Detective Enrique [Chavary].

[MS. LEVINE]: At any time during your investigation after speaking to Detective [Chavary], at any time was Roberto [sic] Ruiz a suspect in this case?

MRS. GEORGI: Objection, calls for hearsay.

THE COURT: Overruled.

A. No.

[MS. LEVINE]: Did you, sir, you, ever drive the route of Alberto Ruiz, the route that he provided to Detective [Chavary]?

A. No, I did not.

[MS. LEVINE]: Why not?

A. He wasn't a suspect.

MRS. GEORGI: Objection, calls for hearsay.

[MS. LEVINE]: Calls for present sense impression of what he did.

THE COURT: Overruled. The question is did you.

THE WITNESS: No, I did not.

[MS. LEVINE]: Why not?

A. He was not a suspect to me.

[MS. LEVINE]: Okay. Did you ever order his cellular telephone records?

A. No, I did not.

[MS. LEVINE]: Why not?

- 45 -

A. Again, he was not a suspect to me.

The judge denied the defense's motion for mistrial, explaining: "But see, this is the detective's role in this case. Was this a person of interest that you were investigating or how did they go about investigating."

We cannot ignore that the officers' belief that Ruiz was not a suspect was based, in part, on hearsay statements from other witnesses and officers investigating the case. In view of this fact, it was improper for the trial court to allow this testimony. Indeed, as quoted above, the prosecutor specifically referred to an implicit inadmissible hearsay discussion between Detectives Chavary and Gallagher following Chavary's interview with Ruiz as the basis for Gallagher's beliefs regarding Ruiz. Essentially, the trial court permitted the detectives to testify as to their opinion in this case, which could have been based upon any number of improper inferences drawn from evidence not presented to the jury that Andres could not confront.

This Court's recent opinion in *Lebron v. State*, 232 So. 3d 942 (Fla. 2017), is instructive. In *Lebron*, the allegedly improper statement was made during the opening statements. Specifically, the prosecutor stated: "The police continue fielding investigative leads. And now they know that they are looking for two individuals by the names of Jesus Roman and Joel Lebron." *Id.* at 952. Ultimately, this Court held in *Lebron*:

> [T]here is no violation where a police officer testifies regarding steps taken during an investigation without identifying anyone the police spoke to or alluding to the conversations that took place. *See Evans v. State*, 808 So. 2d 92, 103-04 (Fla. 2001). Additionally, this Court has recognized that an officer can testify about the actions taken based on a tip of information received without describing the tip, the information, or its source. *See State v. Baird*, 572 So. 2d 904 (Fla. 1990).

*Id.*

By contrast, the officers here testified specifically that after Detective Chavary's interview with Ruiz, they no longer considered Ruiz to be a suspect in the case. This testimony constitutes improper opinion testimony, rather than a blanket statement of what the officers did in the case following the interview. The issue in this case is not that the officers testified that they did not drive Ruiz's milk route. The problem, rather, is that after the officers testified as to what they did, they offered their opinion that Ruiz was not a suspect in this case. Indeed, in the question posed to the detectives, the State explicitly referenced "the information, [and] its source." *Id.* (citing *Baird*, 572 So. 2d 904).

This case is similar to *Wilding v. State*, 674 So. 2d 114 (Fla. 1996), *receded from on other grounds by Devoney v. State*, 717 So. 2d 1 (Fla. 1998), where "[d]uring direct examination of the detective, the prosecutor asked whether the anonymous tip received by the detective gave the name [of the defendant.]" *Id.* at 118. "The detective was allowed, over objection, to testify that it did." *Id.* "The

detective further testified that the department began its investigation of the [the

defendant] from the tip . . . ." *Id.* Ultimately, the Court concluded:

> While it might have been permissible to allow the detective to testify that police began the investigation because of a "tip" or "information received," this testimony clearly went beyond that authorized in *State v. Baird*, 572 So. 2d 904 (Fla. 1990). . . .
> . . . .
> In this case, even though the detective never specifically repeated what the informant told him, the clear inference to be drawn from the testimony was that the informant had implicated [the defendant] in the murder and the information received was reliable because it had been verified by police who talked to [the defendant's] family and friends.

*Id.* at 118-19.

This case is also similar to *Norton v. State*, 709 So. 2d 87 (Fla. 1997), where

the Court explained:

> Although we find no error with the detective testifying that he went to the address given to the police by appellant and that there was no tire store at that location, the trial court erred in allowing the detective to testify that, upon a subsequent search of stores in the vicinity, he could not find anyone who sold tires to defendant. The detective's conclusion is predicated on information he secured from someone else, and, therefore, constitutes hearsay to which no exception was offered. *See, e.g.*, *Trotman v. State,* 652 So. 2d 506, 506 (Fla. 3d DCA 1995) (reversing conviction where police officer offered hearsay testimony as to what non-testifying, unidentified witness had told him about defendant's involvement in crime); *Bell v. State*, 595 So. 2d 232, 234 (Fla. 3d DCA 1992) (finding error where police officer testified regarding statements by non-testifying witness); *Burney v. State*, 579 So. 2d 746 (Fla. 4th DCA 1991) (holding that testimony as to statements by unidentified witnesses implicating defendant was inadmissable hearsay when offered to show the logical sequence of events.)

*Id.* at 95. Thus, the issue in *Wilding* and *Norton*, as in this case, was that the hearsay evidence presented led to the inescapable inference that the information in the interview between Ruiz and Detective Chavary led investigators to conclude that they could exclude Ruiz as a suspect and focus only on Andres.

This Court has previously held that great caution should be used when it is known that law enforcement officers will be testifying in a case because it is easy for jurors to give undue weight to law enforcement opinions, especially when that opinion is in regard to who was ultimately responsible for the crime. *See Smith v. State*, 699 So. 2d 629, 636 (Fla. 1997) ("When it is anticipated that law enforcement officers may testify in a case, it is proper to ask prospective jurors about their assumptions concerning the testimony of law enforcement officers.") Additionally, as this Court has previously explained:

> "[E]rror in admitting improper testimony may be exacerbated where the testimony comes from a police officer." *Martinez v. State*, 761 So. 2d 1074, 1080 (Fla. 2000). "When a police officer, who is generally regarded by the jury as disinterested and objective and therefore highly credible, is the corroborating witness, the danger of improperly influencing the jury becomes particularly grave." *Id.* (quoting *Rodriguez v. State*, 609 So. 2d 493, 500 (Fla. 1992)). "There is the danger that jurors will defer to what they perceive to be an officer's special training and access to background information not presented during trial." *Charles*, 79 So. 3d at 235.

*Evans v. State*, 177 So. 3d 1219, 1230 (Fla. 2015). Moreover, this Court has previously held: "[T]here is an increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant's

guilt. In this situation, an opinion about the ultimate issue of guilt could convey the impression that evidence not presented to the jury, but known to the investigating officer, supports the charges against the defendant." *Martinez v. State*, 761 So. 2d 1074, 1080 (Fla. 2000).

The officers in this case were permitted to testify as to their opinion "about the ultimate issue of guilt." It should not matter that the testimony was in regard to the exclusion of a person of interest in the case, rather than to the guilt of the defendant. The prejudicial impact on the defense is the same, if not doubly so. Not only did the testimony serve to negate the defense theory, it also tended to show that Andres more than likely committed the crime.

The improper hearsay testimony, which took the form of the officer's opinion regarding Ruiz's innocence, and implicitly, Andres' guilt, undoubtedly carried great weight in the minds of the jurors and only served to further undermine the defense theory that Ruiz could have murdered the victim. Because Ruiz also testified in the State's case, the testimony by these detectives also improperly bolstered Ruiz's testimony. And, of course, combined with Ruiz's changed testimony that his milk route on the day of the murder did not take him close to the efficiency, the defense was unfairly and improperly disadvantaged. Thus, the officers' testimony went far beyond the actions they undertook when investigating the case, as asserted by the State, and consequently, beyond what this

Court has previously allowed. Accordingly, I would conclude that the trial court erred in allowing the officers' improper opinion testimony regarding Ruiz, and such error should be considered in a cumulative error analysis.

**Limitation of Cross-Examination**

Next, the trial court improperly limited the defense's cross-examination of Jose Perez. As the majority notes, Perez testified on direct examination for the State that Andres never returned to Perez's home after the fire. Majority op. at 16-17. On cross-examination, the defense attempted to inquire as to a particular reason why Andres never returned to the home, but the trial court sustained the State's objection, concluding that such information was outside the scope of cross-examination, which was narrowly limited by the State's decision to ask only whether Perez had seen Andres again. Majority op. at 17. In fact, Perez had told Andres never to return to the home.

I agree that trial courts have broad discretion to impose reasonable limitations on cross-examination. However, I would conclude that the limitation imposed in this case was an abuse of discretion. If the State introduced the fact that Andres never returned to the construction site to complete work, then it was clearly within the scope of the cross-examination of the defense to inquire as to why he did not return. The State used this information to bolster the implication that Andres' reason for not returning was a guilty conscience. The trial court erred

by not giving the defense an opportunity to counter this implication with the plain truth—that Andres was told by the homeowner not to return.

**Improper Closing Argument**

Next, the prosecutor made several improper remarks during closing arguments, which the majority discounts. First, the prosecutor improperly made comments shifting the burden of proof from the prosecutor to the defense. Specifically, the prosecutor argued there was "no evidence that this defendant is not guilty," warned that the defense was trying to distract them, said "don't get fooled," referred to the defense argument as "speculation and guessing" and "a fairytale," and characterized defense counsel as "mean" and "insulting." Contrary to the majority's assertions, this is exactly the type of overzealous advocacy that this Court held was improper in *Cardona v. State*, 185 So. 3d 514 (Fla. 2016). Granting the defendant a new trial in *Cardona*, this Court cautioned that conduct where a prosecutor "exceed[s] the bounds of proper conduct and professionalism and provide[s] a 'textbook' example of overzealous advocacy.' " *Id.* at 516 (alterations in original) (quoting *Gore v. State*, 719 So. 2d 1197, 1202 (Fla. 1998)).

The prosecutor's conduct throughout closing was needlessly overzealous and improperly denigrated the defense's theory of the case and the defense attorneys. Such conduct should not be implicitly permitted by stating that "the State's actions and comments, though unprofessional and questionable, did not rise

to the same level of unprofessionalism exhibited in *Cardona*." Majority op. at 30. Instead, where prosecutors intentionally set out to confuse the jury regarding the burden of proof and disparage the defense case and attorneys, I would conclude that such conduct should weigh heavily in favor of a new trial in a cumulative error analysis.

**Cumulative Error**

Finally, turning to a cumulative error analysis, I would conclude that the totality of the errors in this case, which served to continually undermine the defense theory and trial preparations, warrants a new trial. As to cumulative error this Court has stated:

> Having concluded that multiple errors occurred in this case, we proceed to consider the cumulative effect of those errors to determine whether those errors are harmless. *See McDuffie* [*v. State*], 970 So. 2d [312,] 328 [(Fla. 2007)] (conducting a cumulative harmless error analysis where multiple preserved errors occurred). Harmless error analysis places the burden upon the State, as beneficiary of the errors, to prove there is "no reasonable possibility that the error contributed to" the defendant's conviction. [*State v.* ]*DiGuilio*, 491 So. 2d [1129,] 1138 [(Fla. 1986)]. As we have repeatedly stressed, the harmless error test "is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test" but the "focus is on the effect of the error on the trier-of-fact." *Id.* at 1139.

*Evans*, 177 So. 3d at 1238. Here, there are four errors, all of which were properly preserved by the defense, that should be considered in a cumulative error analysis—(1) the State's failure to disclose Ruiz's change in testimony with regard

- 53 -

to his alibi, (2) the trial court's error in allowing the State to repeatedly introduce the hearsay testimony of Detective Gallagher and Sergeant McCoy as to their belief that Ruiz was not a suspect in this case, (3) the trial court's error in not allowing the defense to inquire on cross-examination why Andres did not return to the Perez home, and (4) the improper comments made by the State during closing arguments.

Taken together, these preserved errors cannot be considered harmless beyond a reasonable doubt. Allowing a key witness for both the State and defense to, unbeknownst to the defense, change his testimony on the stand, thus taking away a key component of the defense theory of the crime, was highly prejudicial. Moreover, the detectives in the case were repeatedly allowed to testify, based on unreliable hearsay evidence, that they did not consider the only other identified potential perpetrator of the crime, Ruiz, a suspect in the case—testimony that was also highly prejudicial to the defense case. Coupling these errors with the errors in not allowing the defense to explain to the jury why Andres never returned to the efficiency following the crime, and the comments made by the State during closing arguments, compel the conclusion that Andres is entitled to a new trial. Though each of these errors is significant in its own right, when considered cumulatively, it is impossible for the State to prove beyond a reasonable doubt that the cumulative effect of these errors did not contribute to Andres' conviction in this case.

# CONCLUSION

In my view the defense team was exemplary in appropriately objecting and pointing out their areas of concern to the trial court. Indeed, a thorough review of the record reflects that not a single instance of potential error was left without objection by the defense. The objected-to errors undercut the defense theory at every turn. Accordingly, while I agree with the majority that Andres is entitled to *Hurst* relief, I would vacate Andres' convictions and remand for a new trial.

An Appeal from the Circuit Court in and for Miami-Dade County,
    Dava J. Tunis, Judge - Case No. 132005CF0126480001XX

Carlos J. Martinez, Public Defender, and Andrew Stanton, Assistant Public Defender, Eleventh Judicial Circuit, Miami, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Melissa R. Shaw, Assistant Attorney General, Miami, Florida,

    for Appellee